## Poillon v. Martin and others.

One who bargains in a matter of advantage, with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence.

This rule is especially applicable to attorneys and solicitors purchasing from their clients.

And the principle applies to the managing clerk in a solicitor's office, who, in that capacity, has acquired the confidence of the client, and who deals with the client in a matter with which he became acquainted, as such clerk.

No court is equal to the development of the truth, in the great proportion of the cases of contracts made where these confidential relations exist. Hence, justice requires that such purchases by solicitors, trustees, and persons in like relations, shall not be permitted.

P., for several years a client of W., and visiting his office very frequently, brought to W. a mortgage of $1000 for foreclosure. A bill was filed, but the suit was stopped on the interest being paid up, and the mortgage returned to P. M., for several years the managing clerk of W., had become familiar and intimate with P., and knew of these proceedings. In a short time thereafter, M. offered to P. $1500 for his mortgage, in worthless post notes of a country bank. The notes were then of doubtful legality, and the bank of doubtful solvency ; but P. accepted them, and transferred the mortgage to M. W., on being asked by P. as to the goodness of the post notes, made an indefinite answer. Within a few days, W. bought the mortgage of M. for $900, and procured P. to cancel the previous transfer and assign to B. for W.'s benefit. After this, J. bought the mortgage of W. in good faith, for value paid, without notice, and received an assignment from B.

*Held,* 1. That M.'s purchase was unduly obtained, and cannot be permitted to stand.

2. That W. purchased of M. with notice of the inequitable character of the proceeding ; and that W.'s duty to his client required him to compel M. to restore the mortgage to P., on learning the facts.

3. That in regard to J., the legal title being in P., as well as the prior equity, P. was entitled to have the mortgage restored to him.

March 19, 20, 21 ; August 5, 1844.

THE bill in this cause was filed on the 14th day of October, 1840, against Martin, Williams, Browne, and Jacobson, and it prayed to have a transfer of a bond and mortgage made by the complainant to Browne, declared fraudulent and void, and to have the same restored. The bond and mortgage were exe-

cuted to the complainant in 1835, to secure $1000, and were a good security.

The defendants, except Browne, answered severally, and the cause was heard on pleadings and proofs. The facts shown, are stated in the opinion of the court.

*H. W. Warner,* for the complainant.

*A. Williams* and *D. Graham,* for the defendants.

THE ASSISTANT VICE-CHANCELLOR.—For two or three years prior to February, 1840, the complainant was a client of the defendant Williams, in a heavy litigated suit in this court, against two of his sons, which continued until some time after the transactions in question. Mr. Williams was both the counsel and the solicitor in the suit in February, 1840, and had been the counsel of the complainant from its outset. During the same period he had conducted other suits for the complainant, who was in Mr. W.'s office frequently, almost daily. The defendant Martin, was a law student nearly entitled to his examination for admission, and was the managing clerk in Mr. Williams' office. He was thus brought into a familiar and almost daily intercourse with the complainant, in relation to his matters of law. In September or October, 1839, the complainant brought the bond and mortgage in question into Mr. W.'s office for foreclosure. Mr. W. filed a foreclosure bill, but the suit was settled and discontinued in November, on the arrears of interest being paid. The balance of the testimony is, that the complainant took the bond and mortgage away from the office.

In February, 1840, Martin who by the foreclosure proceedings became acquainted with the bond and mortgage and its ownership, proposed to buy it of the complainant for $1500 in post notes of the Farmer's Bank of Seneca county. The latter accepted the offer after a day or two, and assigned the securities to Martin. All this took place in Mr. Williams' office. The Farmer's Bank, as it turned out, was a bubble, and the post notes worthless. They were engraved with a vignette, and other enticing externals, such as are used on bank notes issued for circulation. At that time they were of doubtful

character, both in legality and responsibility; and could not have been negotiated in ordinary business transactions, even at the discount at which they were paid for the bond and mortgage. A few days after the transfer, Martin proposed to Mr. W. to buy the bond and mortgage. He advised Martin to re-exchange them with the complainant, as the latter was eccentric and might give Martin trouble. Martin offered to the complainant to return them and receive the post notes, but the offer was refused. Mr. W. then purchased the bond and mortgage of Martin for $900. This was within about ten days after Martin's purchase. It is not proved whether or not he paid Martin the consideration. In the mean time, the complainant had asked Williams whether the post notes were good, and was told that they might or might not be good; some thought they were good and some thought not; he did not know much about them. It does not appear that W. had any information other than this, on the subject.

He placed the bond and mortgage in the hands of G. W. Browne, and procured the complainant to assign them directly to Browne, as of the date of the assignment made to Martin, cancelling the latter. Williams in July 1840, sold the bond and mortgage to the defendant Jacobson, who paid him the amount of it in cash, without knowing of the circumstances above stated, and Browne thereupon transferred them to Jacobson.

These are the prominent features of this case. There are other facts which I may notice hereafter.

*First.* The first inquiry is in reference to the transaction between Martin and the complainant.

I think that if Martin were to be regarded as the solicitor or attorney, the case would not fall within the rule applicable to purchases by attorneys of the subject matter of the litigation from their clients, *in hac re,* as it is expressed. Of this character were the cases of *Jones* v. *Thomas,* (2 Younge & Collyer, 519;) *Howell* v. *Ransom,* (1 N. Y. Legal Observer, 10, before Assistant Vice-Chancellor Hoffman;) and *Merritt* v. *Lambert,* before the Chancellor, October 17, 1843.(a)

(a) Now reported, 10 Paige, 352.

But it is a great principle of this court, that he who bargains in a matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence; and this principle applies to attorneys, trustees or any one else. (Per Lord Eldon in *Gibson* v. *Jeyes*, 6 Ves. 278; where he applied it to the case of an attorney.) He further says that an attorney can never support a purchase' from his client, unless he can prove that his diligence to do the best for the seller, has been as great as if he was only an attorney dealing for that seller with a stranger. And without any fraud or incapacity existing, if it appears that in the bargain he has got an advantage by his diligence being surprised, which advantage he would with due diligence have prevented another person from obtaining, a contract under such circumstances shall not stand. (*Ibid.* 271.)

In *Champion* v. *Rigby*, (1 Russ. & Mylne, 539,) Sir John Leach, Master of the Rolls, said that a solicitor in such a case was bound to prove that he had paid that price which in the exercise of his professional duty, he would have advised his client to accept from a third person. And in *Edwards* v. *Meyrick*, (2 Hare's Rep. 60, and S. C. 6 Lond. Jur. Rep. 924,) the same principle was declared by Sir James Wigram, vice-chancellor; and that the court throws on the attorney the *onus* of proving that every thing connected with the transaction was fair.

In *Carter* v. *Palmer*, (8 Clark & Fin. 657,) C. had been the counsel and confidential adviser of P. for ten years prior to 1831, when that relationship ceased. During several years of the time, he had advised and participated from time to time in attempts made by P. to compromise large claims of M. against him, and C. had become familiar with those claims and the means and expectations of P. In 1833, C. bought the claims of M. for about one third of their amount. It was held that he was disabled from buying them for his own benefit without his client's permission; that the disability continued, as long as the reasons on which it was founded continued to operate; and that he was entitled to claim from P. only the sum which he paid, with interest thereon. (And see *Bulkley* v. *Wilford*, 2 Cl. & Fin. 102. 177. 183.)

Poillon *v.* Martin.

These principles apply to Mr. Williams as well as to Martin. I state them now to avoid repetition.

To return to the transaction between the complainant and Martin. The latter by his situation as head clerk of Mr. Williams, intrusted with the management of his professional business in his office, had become familiarly and intimately acquainted with the complainant, and was doubtless in the habit of frequent and confidential conversations with him relative to his long pending chancery suit. Martin was thus in a position which naturally and inevitably led the complainant to repose great confidence in him; and although it is not to be presumed that it would subject the complainant to that "crushing influence" which Lord Thurlow and Lord Erskine ascribed to the relation of attorney and client, and which would be insupportable but for the vigilance with which the law guards transactions between them; yet it cannot be doubted but that this confidence was so great as to require the application of the principle laid down by Lord Eldon. Without reference, then, to the rule as between attorney and client, does it appear that Martin made a reasonable use of the confidence which he had acquired ?

I feel no doubt in saying that he did not. Instead of informing the complainant that the post notes were a suspicious and unsafe security, he pursued a course well adapted to incite his cupidity, and to make him believe that he was effecting an advantageous sale of his bond and mortgage.

The form which Martin subsequently played off, of offering to return the securities, and receive the post notes, was calculated to blind the complainant and confirm him in the belief that he had made a' great bargain. It would naturally have the effect to assure him that men much better educated and skilled in business than himself, esteemed these showy post notes to be of substantial value ; while neither of those men advised him to return them, or said a word to dispel his illusion.

Nor do I feel any difficulty in extending to this transaction, the principle so justly applied to purchasers by attorneys and solicitors. Not that I would say that in every case, the principle should be applied to a clerk in the office of the attorney. Each

case must depend on its circumstances. It is well known that in the course of professional business, where there are two or three partners, and as is usual, a principal clerk; the latter will necessarily be brought into contact with many of the clients, oftener than either one of the partners, and not unfrequently obtain the confidence of some clients to a far greater extent than the partner who has but seldom met with those clients. Yet such partner, although there may be no sort of intimacy between him and the client, nor any real confidence or influence, cannot purchase of that client, without subjecting himself to the burthen of proving that he advised the client against himself, as he would have done against a stranger bargaining for the same property. And it would be trifling with this great and valuable principle of equity to say, that while the partner is thus restricted, the clerk having the client's confidence, could buy of him property, the existence and situation of which came to his knowledge as clerk, and negotiate and consummate the purchase in the office of the attorneys, on the same footing that he could deal with an entire stranger.

In like manner a greater intimacy and confidence between the chief clerk and clients, occur where the attorney or counsel is much of the time absent from his office, attending the courts, or engaged elsewhere.

I do not consider the rule of equity so lame, as not to afford protection to clients against the influence thus naturally and inevitably acquired.

In this case, although the bond and mortgage were no longer in litigation, all the reasons for the disability of the solicitor to purchase them, continued in full force. And I am bound to hold that the purchase of the bond and mortgage by Martin was unduly obtained, and that if the affair were between him alone and the complainant, the purchase could not be permitted to stand.

*Second.* As to Mr. Williams's position in the case.

He does not appear as a bona fide purchaser without notice. He has omitted to prove the payment of the consideration; and as to notice, he was aware that Martin had obtained the securities in a manner that was at least inequitable.

There are other considerations applicable to Mr. W. which I feel compelled to notice, although I do so with regret. The complainant was his client, and the continuance of that sacred relationship for years, had obtained for Mr. W. an influence over him, which Mr. W., according to his own language, thought was unbounded. He learned that his chief clerk had been purchasing of this client, for doubtful post notes of a country bank, a bond and mortgage of substantial value, which shortly before was in his hands for collection. The client asked of Mr. W. his opinion as to the value of those post notes. He could not have doubted but that a single word from him would have ended the transaction. Now it appears to me that his duty to the complainant was plain and imperative. He should have advised him promptly and decisively, to have nothing to do with the post notes. He should have rebuked his clerk for taking advantage of his position in the office, to make such bargains with the clients of his principal. Instead of advising the clerk to re-exchange, because the complainant was eccentric and litigious; he should have *required* him to do it instantly, because the transaction was abhorrent to equity and good faith. Instead of buying the bond and mortgage himself, after Martin by his hollow offer to re-exchange had caused the client to clutch with a more tenacious grasp his glittering prize; he should have exerted his just influence upon both, to have cancelled the transaction.

I do not see how the principle of law which prohibits attorneys and counsel from deriving a benefit from bargains made with their clients, while having the care of their property, can be maintained, if the purchase of this bond and mortgage by Mr. Williams were to be upheld.

I desire to impute no fraud to him, no intention to do wrong, and deeply regret that he did not take a different view of the case when it first came to his notice. But this case shows how easy it would otherwise be to evade and nullify that principle. The same influence which affects the client, pervades the confidential clerk. The attorney can readily increase the clerk's consideration and influence with the client. He can instruct the clerk, and point out the opportunities and means

of dealing to advantage with the client. By long and confidential intercourse, in which the client has laid bare his bosom to the study of the attorney, the latter becomes thoroughly versed in his disposition and character. Thus, the attorney can, without being suspected, mould the client's mind to take a favorable view of the clerk's offer ; and if openly appealed to by the client, may, by a nod, a shrug, or an ambiguous answer, confirm him in his disposition to complete the bargain, or at least, do nothing to shake it. Then, when the transfers are made, and the speculation clenched, the clerk can assign it to the principal, and the betrayed client will find, on appealing to the laws, that they had been insulted and successfully evaded.

Such things may well happen, and no court is equal to the examination and development of the truth, in a great proportion of the cases where these confidential relations exist. Hence the general interests of justice require, that purchases by persons sustaining the character of solicitors, trustees, &c., from their clients or beneficiaries of their property, or respecting which they have a duty to perform, shall not be permitted, however honest the ostensible circumstances may appear.(*a*)

Upon these grounds I am constrained to avoid the assignment of the bond and mortgage in question to Martin, and the subsequent assignment which was made to Browne for the benefit of Mr. Williams.

*Third.* As to the defendant Jacobson. To show the bearing of the testimony, I will state the complainant's ground. He claims that Williams acted as Jacobson's agent in the transfer to the latter; that thus Jacobson is chargeable with all the notice that Williams possessed; and that the mortgage being a thing in action, Jacobson cannot allege the defence of an innocent purchaser without notice, and that he has but an equity by the assignment, whereas the complainant has the prior equity and the legal title.

---

(*a*) See further on purchases, &c., by solicitors, *Ex parte James*, (8 Ves. 337 ;) *Wood* v. *Downes*, (18 Ves. 126 ;) *Nokes* v. *Warton*, (5 Beav. 448 ;) *In re Martin*, (6 Beav. 336, 341 ;) and by others in relations of confidence, *Gibson* v. *Russell*, (2 Y. & Coll. Ch. Ca. 104 ;) *Taylor* v. *Salmon*, (4 M. & C. 134.)

Poillon *v.* Martin.

1. As to the agency. The answer was required to be put in on oath, and it denies the agency explicitly.

There is no proof to rebut the answer. The fact that Mr. Williams subsequently had the mortgage to collect, proves nothing. The deputy register's entry, that he recorded the assignment to Jacobson at Williams's request, does not prove that fact. Nor does the statement in the answer that Jacobson procured it to be done, prove that Williams did it.

It is said that the answer does not meet the allegation that Jacobson holds the assignment for Williams's benefit, and it is therefore admitted. Although the answer does not, in the identical words of the bill, deny that allegation, it does deny it in substance. Its positive statements are inconsistent with the fact that he holds the securities for Williams's benefit.

2. As to notice to Jacobson. Aside from the agency of Williams in his behalf, which is not proved, the complainant relies on the circumstance that he dealt with Williams only, never saw Browne, and yet received an assignment from Browne ; and this it is said, was sufficient to put him on inquiry. I do not think that it was. It was a transaction of daily occurrence in the sale of stocks, securities and things in action.

3. Jacobson having purchased and paid for these securities in good faith, the more important point remains. Is his title therefore better than the complainant's, who had a right to them in the hands of Browne?

The rule of equity that a bond or other chose in action, is liable to the same equity in the hands of the assignee that existed against it in the hands of the obligee, has usually been applied in the adjudged cases, to equities in favor of the original debtor. Such were the principal cases that were cited at the hearing. The principle of the rule applies also to equities or rights subsisting in a prior assignor as against the immediate assignor.

The assignee of a bond and mortgage obtains no *legal title*. They are assignable only in equity ; at law he must proceed in the name of the obligee.

So in this case the legal title was in the complainant as mortgagee. Browne acquired ostensibly an equitable title by the assignment, but it was liable to be divested by the complainant's

equity arising out of the wrongful manner in which the mortgage was obtained from him. Jacobson became vested with an equitable title, by his purchase and the assignment to him. But as the complainant had the legal title and the prior equity, he must prevail over Jacobson.

Again, without reference to the legal title, the complainant has the prior equity, and then the maxim applies, *qui prior est in tempore, potior est in jure*. It is said that the complainant's refusal to re-exchange postpones his equity to that of Jacobson.

I think not, considering the circumstances of that refusal.

The authorities sustain the complainant's prior right. In *Van Rensselaer* v. *Stafford*, (Hopkins' R. 569,) affirmed on appeal in 9 Cowen, 316 ; one Van Dusen sold to W. lands which he had bought of Van Rensselaer, and for which he was partly indebted to V. R., and took from W. two mortgages of equal date, intending that one should have priority and be assigned to V. R. for the original purchase money due to him. The mortgages were registered concurrently, but the one was soon after assigned to V. R. Afterwards V. D. assigned the other to Stafford in good faith, for full value, without notice of V. R.'s intended priority. It was held that Stafford stood in the place of V. D., and held his mortgage subject to all the equity which V. R. had against V. D., and V. R.'s mortgage was declared to have priority. In *Covell* v. *The Tradesmen's Bank*, (1 Paige's R. 131,) Covell held a sealed note for $2425 against Hunt, payable to himself in a year. He borrowed $100 of Mullins, and pledged the note to secure it, indorsing his name in blank. M. being indebted to the Tradesmen's Bank in $2600, and pretending to own the note, transferred it to the bank in payment of $1000 of that debt, and received the balance of the note in money. He indorsed his name on the note in blank, and delivered it to the bank. All this was within two months after the sealed note was given. Covell having paid M. in full, claimed the note of the bank ; and it was held that having both the prior equity and the legal title, he was entitled to the note.

The blank indorsements in that case were equivalent to the assignments here, and for aught I can see, the case is perfectly decisive of the one before me.

*Fourth.* The only question as to the defendant Browne, is as to the costs. It is stipulated that they abide the event of the suit, and that the bill against him be dismissed. He suffered his name to be used without any interest, in a transaction that was inequitable; and he has no claim for costs, although ignorant of the wrong.

The complainant is entitled to a decree for the restoration of the bond and mortgage by the defendants, or for the proceeds of the same if collected. He is also entitled to costs against Martin and Williams.