## BUSH, Administrator, &c., *v.* LATHROP.

The equities existing between the assignor and assignee of a chose in action, not negotiable, attend the title transferred to a subsequent assignee for value and without notice. The latter takes the exact position of his vendor.

*So held,* where a mortgage was transferred by an assignee thereof, by an instrument absolute upon its face, but was taken, in fact, as security for a much smaller sum than that due upon the mortgage, and the second assignee transferred it for full value to a third person, without notice.

The supposed distinction between latent equities, so called, and those existing between the original parties to the instrument, examined and repudiated, *per* DENIO, J.

APPEAL from the Supreme Court. Action to compel the defendant to assign to the plaintiff a bond and mortgage executed by one Addis to one Cole, and by the latter assigned to Noble, the plaintiff's intestate, and which had come to the hands of the defendant under the circumstances hereinafter mentioned. The trial was before Mr. Justice BALCOM, without a jury. From his finding, these facts appeared: The bond and mortgage were given to secure the sum of $1,400 and interest, by certain installments. On the 15th May, 1857, Noble, being the owner of them, and being indebted to one Joseph W. Preston, in the sum of $268.20, gave him his promissory note for that amount, and assigned the bond and mortgage to him, as security for the payment of the note. Preston, at the same time, gave back a receipt acknowledging the assignment to him of the bond and mortgage, and agreeing to return the same to Noble on the payment of the note. The assignment was written on the back of the mortgage, and expressed a consideration of $268.20; and it contained a covenant that $1,400 and interest was due on the bond and mortgage: in other respects, it was absolute in its terms. Noble died on the 19th November following, and the plaintiff was soon afterwards appointed his administrator. On the 18th day of January, 1858, Preston assigned the bond and mortgage to James H. Smith and War-

ren Newton. This assignment expressed a consideration of $1,475, and contained a covenant on the part of the assignor that $1,400 was due on the securities. There was no evidence of the actual payment of any part of the consideration mentioned. On the 24th day of February following, Smith and Newton assigned the bond and mortgage to the defendant. This instrument was expressed to be in consideration of $1,488. 76, and the assignors covenanted that that amount was due upon the bond and mortgage. The judge found that the last mentioned sum was paid by the defendant to his assignors in money and a promissory note. The evidence on that point was this: D. T. Miller, a subscribing witness to the assignment to the defendant, testified that he saw the money counted and paid to the amount of $1,300, and that, for the balance, the defendant gave his note. The plaintiff then proved that the defendant had said that he paid for the mortgage in a check on a bank. The defendant was then examined as a witness in his own behalf, and testified that he paid for the bond and mortgage the full amount expressed in the assignment. He did not appear to have been asked by his own or by the plaintiff's counsel whether he then believed Smith and Newton to be the absolute owners of the bond and mortgage, or anything to that effect, and he did not say anything upon that point. It appeared that the defendant was a brother-in-law of Warren Newton, and that Smith and Newton both lived in a town adjoining that in which the defendant resided; but neither of them were examined as witnesses. The plaintiff, as administrator, took possession of the effects of the deceased in December, 1857, and then found the receipt signed by Preston among his papers. He could not find Preston, who seems to have left the country, or learn where the bond and mortgage were, until the 1st March, 1858, when he ascertained that they were in the hands of the defendant; upon which he immediately tendered him the amount of principal and interest due on the note of Noble, and demanded a reässignment of the securities, which he refused to execute. The plaintiff then deposited the amount in a bank for his use, first informing him that he should do so.

The mortgaged premises were shown to be worth about $2,000.

Upon the subject of the *bona fides* of the assignees under Noble, the finding was as follows: "There is no evidence to show that Smith and Newton paid the consideration mentioned in the assignment to them, except that contained in the assignment; nor is there any proof to impeach the good faith of their purchase, unless the smallness of the consideration expressed in the assignment from Noble to Preston impeach it." " There is no more evidence to affect the *bona fides* of the defendant's purchase, than there is to show bad faith on the part of Smith and Newton." The legal conclusion of the judge was, that the defendant had an absolute and unredeemable title to the bond and mortgage, and he gave judgment accordingly in favor of the defendant; but this judgment was reversed on appeal at the general term in the sixth district, where final judgment was given in favor of the plaintiff, and the defendant was required to assign the bond and mortgage to him, and to pay a sum that he had received thereon of the mortgagor for interest, upon being paid the amount of the note and interest. The defendant thereupon brought the case here by appeal.

*Isaac S. Newton*, for the appellant.

*Giles W. Hotchkiss*, for the respondent.

DENIO, J.  For the purpose of coming at once to the question of law which was discussed on the argument, I shall assume that the defendant purchased the bond and mortgage of Smith and Newton in good faith, paying them the amount purporting to be due on these securities, without notice of any fact tending to impeach the title which they professed to have. The question is, whether the right which passed by the assignment was subject to the equity of Noble's representatives to redeem the mortgage by paying the amount for which it had been pledged to Preston. That the right to redeem as against Preston was perfect, is not questioned. Smith and Newton stood

precisely in Preston's place, because it was not shown that they paid anything for the assignment which they obtained. But they had an apparent title; and if the defendant purchased of them under the circumstances which I have assumed, he is capable of raising this question, though the title of his assignors, Smith and Newton, may have been fraudulent as against the plaintiff. All the cases agree that the purchaser of a chose in action takes the interest purchased, subject to all the defences, legal and equitable, of the debtor who issued the security. It is unnecessary to refer to authorities for this general principle, or to point out the exceptions to it which have been created by the custom of merchants or by positive statutes. It is enough that the present case is not claimed to fall within any of those exceptions. But the rule, if limited in the manner I have stated it, does not aid the plaintiff; for it is not the equity of the debtor in these securities which is in question, but of the plaintiff's intestate against Preston, his immediate assignee; and the question is, whether the defendant is to be deemed to have purchased subject to this equity, or whether his assignment confers upon him a better title than his assignors, who were confessedly liable to it, had. The defendant claims that this is a latent equity, available only between the parties to it, and that it did not accompany the security when it passed into the hands of a subsequent owner. The rule, as generally stated, is, that the purchaser takes only the interest which his assignor had to part with; or, as expressed by Lord THURLOW, "A purchaser of a chose in action must always abide by the case of the person from whom he buys." "This (he said) I take to be the general rule." (*Davies* v. *Austin*, 1 Ves., 247.) If this is a correct statement of the doctrine, the defendant has no ground to stand on, for he purchased of a party who was clearly liable to the relief sought in this suit. The rule, as thus stated, is the only logical one. In the transmission of property, of any kind, from one person to another, the former owner can, in reason, only transfer what he himself has to part with, and the other can only take what is thus transferred to him. The cases in which, from motives of policy, to promote the currency

Bush *v.* Lathrop.

of certain securities, to prevent fraud, or to aid the vigilant against the careless, the party to whom the transfer is made is allowed to claim a greater interest than was possessed by the other, are exceptional; and it is for a party claiming the protection of an exception, to show that it exists in the particular case. This is what the defendant has attempted in the present instance; and it must be admitted that there are judicial opinions, which are entitled to consideration, which favor that view of the case, though I think the rule is settled the other way. The first trace of the controversy which I have met with is found in *Beebee* v. *The Bank of New York* (1 John., 529), decided in 1806, in the Court for the Correction of Errors. The case is one of considerable complication; but it will not be necessary to state the facts further than to say that the defendants claimed as assignees of a judgment for a large amount, recovered in favor of Wardell against Eden. It had been assigned by Wardell to Olcott, and, after that assignment, Wardell had been paid in full by Eden, and had acknowledged satisfaction. The defendants claimed by assignment under Olcott; but the plaintiff proved that the assignment to Olcott was executed to secure a debt which he owed Wardell, and which debt had been paid before the assignment by Olcott. This presented the question whether the defendants, who had no notice of the transaction between Wardell and Olcott, except that the former had executed to the latter an absolute assignment of the judgment, took the transfer to themselves subject to Wardell's equity. Wardell was entitled, as against Olcott, to have back the judgment; and if the defendants' purchase was subject to that right, they got no title under the assignment to them, and Wardell, being the actual owner of the judgment, as well as the formal judgment creditor, had a perfect right to receive payment from Eden, and to acknowledge satisfaction. This having been in fact done, the defendants had no case unless they could maintain that they had a better right than Olcott, under whom they held, could lay claim to. Four of the five judges of the Supreme Court delivered opinions. KENT, Ch. J., was of opinion that, as the defendants had no notice of the purpose for which the

assignment to Olcott was made, they, as subsequent assignees, had a right to regard it as absolute and unconditional, as it purported to be. He remarked that, when it is said that an assignee of a chose in action takes it subject to all equity, it is meant only that the original debtor can make the same defence against the assignee that he could against the assignor. He referred to cases laying down the principle that one purchasing, without notice, from a purchaser with notice of a trust, is not considered in equity as bound by that trust. SPENCER and TOMPKINS, Js., were of a different opinion, which the former supported at considerable length. He considered that the rule was not limited to the equities of the debtor, but, on the contrary, that the purchaser only acquired the right of his immediate assignee, and that, in this case, the defendants assumed the situation and stood in the place of Olcott. TOMPKINS, J., considered the rule announced by Lord THURLOW to be the true one, namely, that the assignee must always abide the case of the one of whom he buys. Judge THOMPSON was in favor of the complainant on other grounds, and did not express any opinion upon this point; and, on the decision, judgment was given in favor of the complainant. If there had been no other questions in the case upon which the complainant might have prevailed, it would have been an adjudication of the court of last resort upon the very point in controversy. As it is, the case has the force of authority upon this point, equally with the large class of cases where the prevailing opinions give more than one reason for the judgment rendered. It is enough, however, for my purpose, to say, that, on this first occasion where the distinction which the present defendant relied on was suggested, it did not meet with favor from the court to which it was addressed. I find nothing further on the question until 1817, when the case of *Murray* v. *Lylburn* came before the Court of Chancery, presided over by Chancellor KENT. Pending a suit against a trustee of real estate for a fraudulent breach of trust, in which an injunction had been obtained, restraining him from disposing of any part of the estate, he sold a lot of land to one of the defendants,

who executed to the trustee a bond and mortgage for the purchase money, which the trustee afterwards assigned to Lylburn, whose representatives were also made defendants. The Chancellor was of opinion that the plaintiff (who was the receiver appointed in the first mentioned suit) might affirm the sale of the land, and claim the bond and mortgage. He then reiterated the principle he had laid down in *Beebee* v. *The Bank of New York*, and referred to a late case before the House of Lords, to be presently mentioned, as sustaining the doctrine. He said the assignee could always go to the debtor and ascertain what claims he might have against the bond or other chose in action which he was about purchasing from the obligor, but he might not be able, with the utmost diligence, to ascertain the latent equity of some third person against the obligee. The case was not, however, decided on that principle, but on the ground that the *lis pendens* between the beneficiaries of the trust and the trustee constituted a notice to all parties dealing with the latter respecting the trust estate. The learned Chancellor took pains expressly to declare, that he placed the right of the *cestui que trust* to pursue the bond and mortgage upon the last mentioned ground. (2 J. C. R., 441.) In another case, decided shortly afterwards, reported in the same volume (p. 479), the complainant claimed to be equitably entitled to certain mortgages executed by third parties to the defendant Dean, and by him assigned to the other defendants, who claimed the same as *bona fide* purchasers from Dean. The complainant's right to the mortgages arose out of transactions with Dean, who, it was assumed, was under an equitable obligation to assign them to the complainant. The question was, whether the complainant's equity was lost by the purchase and assignment of the mortgages by Dean to the other defendants. It was held that it was not lost, because, as the Chancellor considered, there was a sufficient admission in the answer, that the defendants purchased with knowledge of the complainant's rights. But the Chancellor took occasion to reiterate his opinion that the purchaser of a bond and mortgage took it subject only to the equity of a mortgagor, and not to that of a third person, which he denominated

a latent equity. (*Livingston* v. *Dean.*) It is obvious that neither of these cases furnishes a judicial precedent for the principle relied on by the defendant in the present case, though they exhibit the opinion of a very learned and intelligent judge in its support.

*James* v. *Morey* came before the Court of Errors in 1823. It presented no feature to which the principle under examination could have any application; though an opinion was advanced by one of the judges in conformity with those expressed by Chancellor KENT, in the cases which have been mentioned. The bond and mortgage in question in the case was executed by Johnson to Wattles, and assigned by the latter to James, the complainant. Before the assignment, Wattles had purchased the equity of redemption in a part of the mortgaged premises; and the question was, whether the lien of the mortgage was not thereby extinguished on account of the merger. The defendant purchased the premises of Wattles after the assignment of the mortgage to the complainant, and insisted on the merger to avoid that mortgage. The judgment was for the complainant; it being considered that, under the special circumstances, a merger did not take place; and this was the result of the opinion delivered by Judge SUTHERLAND. In the course of his discussion of the case, however, he affirmed the position that the purchaser of a chose in action takes the security subject only to the equities of the debtor, and not to such as reside in third parties; and quoted largely from the opinions in *Murray* v. *Lylburn* and *Livingston* v. *Dean* in support of the position. What was thus said by the learned judge seems to have been by way of answer to the position of the defendant, that James ought to have recorded his assignment, for the purpose of affording notice to those who should afterwards propose to deal with Wattles respecting the land. The application which the judge makes of the doctrine of Chancellor KENT, thus affirmed by him, appears, from the conclusion of that part of the opinion, as follows: " Admitting, therefore, that the equity of the respondent [the defendant Morey], whatever it may be, as it respects the mortgage, had existed at the

time of the assignment of the mortgage to the appellant [the complainant James]; instead of being bound to give notice of the assignment to the respondent, the appellant would have held the mortgage discharged from the respondent's equity, unless he had personal notice of it." That is, if Morey had bought the land before Wattles had assigned the mortgage to James, and Wattles had then assigned it to him, James could have enforced the mortgage, unless it could have been shown that he had notice of Morey's prior purchase of the land. This being Morey's duty in case he had been prior in time, then, as he was in fact subsequent and not prior, it is argued that James, who was actually first to acquire an interest, was not under any obligation to give the record notice to any one who should afterwards deal with Wattles concerning the land. Thus it will be seen that the doctrine was stated simply by way of illustrating another position. The argument was not a happy one; for, if Morey had purchased the land after Wattles, the seller, had united in himself the equity of redemption and the lien, and while the unity continued, it cannot for a moment be doubted that the mortgage would have been utterly extinguished, and that a subsequent assignment of it would have been a mere nullity, independently of any question of notice.

These are the only occasions, so far as I can find, where the distinction contended for by the defendant has received the countenance of any court or judge in this State; and it is quite plain that none of the cases were decided on the strength of that position. In every instance but one in which the doctrine has been announced, it was a naked *obiter dictum*, and in that case the decision of the court was the other way. On the other hand, there are several cases where the point in judgment involved the determination of the question, and in which the distinction maintained by Chancellor KENT and Judge SUTHERLAND was either expressly or virtually overruled.

The case of *Stafford* v. *Van Rensselaer* was decided by Chancellor SANFORD, and his decree was affirmed in the Court of Errors. (Hopkins' R., 569; 9 Cow., 316, *S. C.*, anno 1827.) The facts were, that one Van Deusen had two mortgages,

executed to him by one Wright, one for $1,180 and the other for $676. They bore the same date and were recorded at the same time, and hence neither had any priority over the other. But Van Deusen was under obligations to Van Rensselaer, the complainant, to furnish him with a first mortgage lien upon the land for $1,180. He accordingly assigned him the larger mortgage, and afterwards, for a valuable consideration, assigned the other to the defendant. The complainant filed the bill to establish the priority of his mortgage, and relied upon the general doctrine that the assignee of such a security stood in the place of his assignor; while the defendant reposed himself upon the distinction of Chancellor KENT, and referred to in *Murray* v. *Lylburn* and *Livingston* v. *Dean.* The Chancellor decided that the complainant was entitled to the preference claimed. He did not distinctly notice the *dicta* of his predecessor, but said that *Clute* v. *Robinson* (2 John., 595) governed the case. That was a judgment of the Court of Errors which affirmed the general doctrine in a case in which the equity protected was that of the original debtor. When the case came before the Court of Errors, the only opinion delivered was by Judge SUTHERLAND, which was in favor of affirmance. He placed his opinion, in part, upon grounds not applicable here; but he said that the defendants were mere assignees of a chose in action, and that the claims of the complainant were "not to be considered as the latent equities of a third person, a mere stranger, against the assignor;" and, among other authorities, he referred to the two cases in 2d Johnson Chancery Reports, and to *James* v. *Morey.* If this was not a latent equity, within the supposed rule, it would be difficult to say what would constitute one. The mortgagor had no defence against the mortgage, while Van Rensselaer, who was clothed with the equity which was protected, was a third person and a stranger, in a legal sense, to all the parties to the mortgage and the assignment; and as to the equity being a latent one, it was certainly entitled to be so qualified, if not to be discoverable from an examination of the papers, and to be unknown to the assignee, could make it so; and I cannot conceive any other sense in which the term could

be used in this connection. I consider, therefore, that though Judge SUTHERLAND adhered in terms to the distinction which he had laid down in *James* v. *Morey*, he practically overruled it in his opinion in the case, which was adopted by the Court of Errors.

The next case on this subject (*Covell* v. *The Tradesmen's Bank*, 1 Paige, 131), is strikingly like the one under review. The plaintiff was possessed of a sealed note against T. & J. Hunt, for $2,425, which he pledged to Mullins to secure a loan of $1,000, who gave him back a receipt, promising to return the note when the loan should be paid. Mullins pledged it to the Tradesmen's Bank, defendants, in part to secure $1,000 of an existing debt, the bank advancing the balance of the note in cash. On each occasion the party making the transfer indorsed his name on the note, in order thereby to assign it. Shortly after the plaintiff made the transfer to Mullins, the latter received money belonging to the plaintiff to more than the amount of the loan. The bank, on receiving the note from Mullins, notified the makers, the Messrs. Hunt, that they were to pay only to the bank; and as soon as the plaintiff heard that the note had been transferred by Mullins, he gave notice of his rights to the bank. The makers, in the meantime, paid the note, and the money was placed in deposit, to abide the judgment of the court in the suit. The defendant's counsel maintained that the plaintiff's right was a latent equity, within the sense of Chancellor KENT's rule in the cases in the 2d Johnson's Chancery Reports, which he relied on. The Chancellor held that the plaintiff had the preferable right, and decreed accordingly. He placed his conclusion very much on the ground that the plaintiff had the legal title (that is, the power to sue on the note in his own name, whereas the defendant's title was equitable, as he could only sue in the name of the plaintiff, the payee), and at least an equal equity with the defendant, and that in such cases the legal title must prevail; but he added that if neither had the legal title, the plaintiff's equity, being the earliest in point of time, was entitled to the priority in satisfaction. Without in terms disapproving

of Chancellor KENT's distinction, he reviewed the case cited
by him from 1 Dow's Parliamentary Reports (*Redfearn* v. *Fer-
rier*, p. 50), and showed that the subject there in controversy
was not a chose in action, but shares in a corporation; and that
the assignee was allowed to prevail over an equity existing
in another party against the assignor, on the ground that such
assignee had obtained the legal title by giving notice of the
transfer to the company.

The case of *Muir* v. *Schenck* (3 Hill, 228) was debt on a
money bond accompanying a mortgage executed by the defend-
ant to the plaintiff. The obligee in the bond (the nominal
plaintiff) had twice assigned it, first to Doty, as security for a
note he held against the obligee, and again to Austin, in full
property, in payment of certain notes; his purchase being made
without notice of the prior assignment to Doty. Both assignees
had notified the defendant of their respective rights; but he
elected to pay to Austin, who acknowledged satisfaction of the
mortgage. The action was brought for the benefit of Doty,
the first assignee. The Circuit Judge ordered a verdict for the
defendant, which was set aside by the Supreme Court. The
opinion, which was quite elaborate, was prepared by Judge
COWEN. He considered that the case presented a conflict of
equitable claims, and in such cases he said the rule was the
same at law as in equity, namely, *qui prior est tempore potior
est jure.* He noticed the opinions of Chancellor KENT, in the
two cases so often mentioned, and showed that they were decided
on other grounds. He examined *Redfearn* v. *Ferrier*, relied
on by the Chancellor, which he said was decided under the
Scotch law, which allowed a certain effect to notice by the
assignee of a chose in action to the debtor, which had been
given in that case. The judge also referred to the fact that, in
*Murray* v. *Lylburn* and *Livingston* v. *Dean*, the prior equity did
not arise out of an actual assignment of the securities, but only
an implied trust, which was called a latent equity; but, as
between successive express assignments, he considered that the
one which was first in time conferred the preferable right. He

also showed that this was the rule adopted in several States of the Union.

In *Poillon* v. *Martin* (1 Sand. Ch., 569), and in *Sweet* v. *Van Wyck* (3 Barb. Ch., 647), the rule that the last assignee takes subject to prior assignments, of which he had no notice, is applied, without any allusion to the contrary opinions intimated in the earlier cases. It is thus shown that the distinction of Chancellor KENT and Judge SUTHERLAND never took root in our jurisprudence, notwithstanding the confidence with which it was advanced by those eminent judges; but, on the contrary, for more than thirty years last past, the precedents in favor of the prior equity have been uniform and of frequent occurrence, and that, in one case, namely, in *Stafford* v. *Van Rensselaer*, the Court of Errors virtually pronounced against the distinction. The question was referred to in a late opinion in this court, prepared by Mr. Justice S. B. STRONG, in *Mickles* v. *Townsend* (18 N. Y., 375). It was not, however, a point in the case; and, so far as the distinction was spoken of, it was treated with marked disfavor.

If the intimation of Judge COWEN, that the prior equity, in order to be entitled to protection, must amount to an express assignment, be followed, the present case would be within the spirit of the rule. If we consider Preston an absolute assignee of the securities, his agreement with Noble to assign or give them up to him, on being paid $268.20, is an express contract equivalent to an assignment upon condition. The difference between such a contract and an express assignment, of which the subsequent assignee had no notice, is merely nominal.

It is unnecessary to maintain that Noble, or his representatives, had a legal title to the securities. If such a right existed, it resided in Cole, the original obligee of the bond, who is the only party who, by the rules of the common law, could maintain an action upon it. All the subsequent assignees must be considered as holding merely equitable interests; and, as between parties so circumstanced, priority of time, as has been shown, confers a preferable right. The Code, indeed, requires all actions to be prosecuted in the name of the real party in

interest; but this rule does not change, in any respect, the actual rights of the assignees between themselves. This was always the method of procedure in courts of equity. The Code has adopted the Chancery rule as to the formal parties on the record, without intending to affect the rights of parties in other respects.

It is only as to unsettled questions that courts can, with propriety, take into consideration motives of policy. Where a rule has been firmly established, it is for the legislature to change it if it is thought to be promotive of injustice. The courts have no such power. A distinction, of the nature suggested by Chancellor KENT, no doubt exists between the rights of the debtor in this class of cases and those of third persons who have dealt with the original creditor or his assignee. One proposing to purchase the security can easily ascertain whether the person who gave it pretends to any defence. If he disclaim having any, and a purchase is made on the faith of such disclaimer, the assignee will be entirely safe against any which shall be afterwards asserted. But a purchaser has no clue by which he can protect himself against the equities of third persons. He may inquire of all the parties in the chain of title, but their admissions will not affect a party in possession of an equitable right derived from them. The purchase must be made, if at all, in reliance upon the good faith of the seller, and, where there have been several assignments, of those from whom he derived title. This quality certainly forms an impediment to the free negotiation and circulation of that class of choses in action. Whether sound policy requires that it should be removed, and the circulation of such securities promoted, is a question upon which men may differ. At one period in the history of the law, it was thought highly impolitic to encourage their negotiation, and courts of law would not protect the equitable rights of the assignees. But courts of equity took the case into their hands, and recognized these rights as far as it was possible; and their principles were afterwards followed by the other courts. Still, full negotiable qualities have not been attributed to them. The purchaser, as

a general rule, takes only such title as the seller had, and no other. If they are to be further assimilated to commercial paper the legislature must so provide.

It is necessary to add that I do not consider that the assignee stands in the place of the assignor, in every respect, in all cases. The suggestion, made in the earliest of the cases in this State, that the assignor, if a *bona fide* purchaser without notice, was not prejudiced by the notice of his assignor, was well founded, and has since been repeatedly recognized. (*Jackson* v. *Henry*, 10 John., 185; *Jackson* v. *Van Valkenburgh*, 8 Cow., 260; *Varick* v. *Briggs*, 6 Paige, 323; *Fort* v. *Burch*, 5 Denio, 187.) It was not notice which prejudiced the title of the parties under whom the defendant claims, but the fact that Noble, the last absolute owner of the bond and mortgage, never parted with his title except on condition that it should be returned to him on payment of a comparatively small sum of money. The defendant claims under that conditional assignment; and, though he may not have been aware of the condition, he is, nevertheless, bound by it.

These considerations lead to the conclusion that the judgment of the special term was properly set aside. Regularly, a new trial should have been awarded; but the counsel for the defendant, on the argument before us, was understood not to desire a reversal of the judgment of the general term, unless we should agree with him in the position which has been discussed. If the other judges concur in the conclusion to which I have arrived, our judgment will be a simple affirmance of that of the general term which has been appealed from.

If that should not be the opinion of the court, it will remain to consider whether the defendant should be regarded as a *bona fide* purchaser without notice. The judge before whom the case was tried has not found, one way or the other, on that question. He says only that there was no more evidence of bad faith in the defendant than in Smith and Newton, and that there was no proof to impeach their good faith, except the statement of the consideration of the assignment from Noble to Preston. In other words, he refers to the evidence, without

stating any conclusion of fact. The assignment to Preston was in the chain of title, which the defendant must necessarily have looked into, to ascertain the authority of Smith and Newton to sell to him. It there appeared that a debt of $1,400, well secured by a mortgage of real estate, had been sold for less than one-fifth of that sum. That was enough, in my opinion, to put an ordinarily careful person upon inquiry; but it does not appear that any was made. The consideration stated was, of course, enough to support the transfer; and if, upon making reasonable inquiry in proper quarters, he had been led to believe that the purchase by Preston was, notwithstanding, absolute, I think he would have been entitled to the character of a *bona fide* purchaser of the bond and mortgage. The defendant was himself a witness in his own behalf, and might have said, if the truth was so, that he purchased without notice of any condition in the assignment to Preston, and in the belief that there was no flaw in his title to the securities, and that his own purchase was absolute, and without any understanding with Smith and Newton that the money should, in any event, be returned. Since the law allows him to swear in his own behalf, I think he ought to have denied notice, whether inquired of by the plaintiff or not. If my conclusion on the first question discussed is not adopted, I shall be in favor of a new trial, in order that the *bona fides* of the defendant's purchase may be inquired into and determined as a question of fact.

Selden, Davies, and Clerke, Js., dissented.

Judgment affirmed.