THE FIRST NATIONAL BANK OF CORRY, PA., AND
THE FIRST NATIONAL BANK OF WESTFIELD, N. Y.,
APPELLANTS, *v.* ORSON STILES AND OTHERS, RESPONDENTS.

*Estoppel—when a mortgagor is estopped from enforcing an agreement upon which
the mortgage was given, as against an assignee thereof—when one for whose
benefit the mortgage was given is also estopped.*

Prior to September 26, 1873, three drafts, amounting in all to $10,000, drawn
by one McKay upon one Nash, by whom they were accepted for McKay's
accommodation, had been discounted by the persons in whose favor they
were drawn. The drafts were about to fall due, and McKay, being unable to
pay them, executed and delivered to Nash a bond for $10,000, secured by
a mortgage upon real estate, upon the agreement and understanding that
Nash should sell the same for cash and apply the proceeds thereof to the
payment of the said drafts. On the next day the mortgagee, without the
knowledge or consent of the mortgagor, or of the owners and holders of
the drafts, assigned and delivered the said bond and mortgage to one Stiles,
as president of a banking company, to be held by it as collateral security
for the payment of any and all sums of money which were then or might
thereafter become due from Nash to the said company. The company
had no knowledge or information of the purpose for which the bond and
mortgage were given, or of the existence of the drafts, and took the assign-
ment in good faith for the purpose therein expressed, and at the time of so
doing discounted commercial paper for the said Nash, to an amount exceed-
ing $10,000, the proceeds of which were applied in taking up paper pre-
viously discounted for him, and upon which he and other parties were
liable, Nash being then indebted to the company in an amount exceeding
that sum. Thereafter the company purchased the said bond and mortgage
absolutely from Nash, and surrendered to him commercial paper upon which
he and other parties were liable, without knowledge of the purpose for
which the bond and mortgage were given, or of the existence of the drafts,
and in the belief that Nash had the right to so dispose of it. At the time
of giving the bond and mortgage, McKay was indebted to Nash, including
the acceptances on the drafts, in the sum of about $15,000, and Nash cred-
ited him with the amount of the bond and mortgage about six months after
it was given to him.

In an action brought by the holders of the drafts which remained unpaid, to
restrain the company from selling the land under a decree entered in an
action brought by it for the foreclosure of the said mortgage,

*Held,* that McKay, by giving to Nash a mortgage purporting on its face to be
founded on a valuable consideration, and containing no reference to the
condition or agreement upon which it was given, was estopped from dis-
puting the validity of the title acquired by the company by its assignment
from Nash, and from insisting upon the moneys arising from the sale being
applied to the payment of the drafts.

That as the holders of the drafts claimed under the mortgage, they could not repudiate its form or the legal consequences flowing therefrom; and that, as the estoppel was created by the form in which the mortgage was given, they also were estopped from disputing the validity of the company's title.

APPEAL from a judgment in favor of the defendants, entered upon the report of a referee.

*R. P. Marvin* and *H. O. Lakin,* for the appellants. The creditors of McKay were entitled to the benefit of the security given to Nash, at the time the mortgage was made to Nash, and Nash could not, by any act of his, deprive the plaintiffs of their equity. (*Heath* v. *Hand,* 9 Paige, 432–435, and cases therein cited; *Bank of Auburn* v. *Throop,* 18 Johns., 505; *Evertson* v. *Booth,* 19 Id., 494; *Morrice* v. *Harrison,* 1 Eq. Ca. Abr., 93; *Eastman* v. *Foster,* 8 Met., 19–23; *Moses* v. *Murgatoyd,* 1 Johns. Ch., 127–129.) The assignee of a judgment or other chose in action, takes it subject to all the equities which existed against it in the hands of the original holders. (*Heath* v. *Hand,* 1 Paige, 329; White & Tudors' Eq. Cas., Law Lib., vol. 62, p. 233, 3d series; *Ellis* v. *Messirvin,* 11 Paige, 464; *Bush* v. *Lathrop,* 22 N. Y., 535; *Comstock* v. *Hier,* 73 N. Y., 273.)

*Morris & Russell,* for the respondents. If a trust was created by the execution of the mortgage and its delivery, which plaintiffs could have enforced as against Nash and McKay, and which was irrevocable, as the plaintiffs insist, then Nash was clothed with the legal title of the mortgage, which was the trust estate, and could give a good and perfect title to an innocent purchaser giving a good and valuable consideration for the same. (Tiffany & Bullard on Trusts, 788, 818; Hill on Trusts, 4 Am. ed., marg. p. 165, 510; 2 Story Eq. Jur., 309, § 977; *Briggs* v. *Davis,* 20 N. Y., 23; 3 Paige, 437; 41 Barb. 285; *Switch* v. *Wells,* 48 N. Y., 585; *Dillaye* v. *Commercial Bank of Whitehall,* 51 Id., 347.) When McKay made the mortgage absolute on its face acknowledging an indebtedness, and directed Nash to sell the same (notwithstanding the non-negotiable character of the mortgage) McKay and those claiming under him are estopped from asserting title as against a *bona fide* assignee of the mortgage for value and without notice. (*Moore* v. *Metropolitan*

*National Bank*, 55 N. Y., 41; *McNiel* v. *Tenth National Bank*, 46 Id., 325; Story on Agency, §§ 73, 127, p. 154, note 1.)

TALCOTT, P. J. :

The complaint in this case sets forth in substance that one Joshua W. McKay made his several drafts in favor of the bank at Corry, amounting in all to $5,000, and made his other drafts in favor of the bank at Westfield, amounting in all to $4,000, and made his certain other draft for $1,000 in favor of the defendant Blaine and others named, who were partners carrying on a banking business at North East, in Pennsylvania, all of which drafts were discounted by those banks respectively prior to September 26, 1873, all of which drafts were drawn on the defendant Nash, and by him accepted for the accommodation of McKay, the drawee, and all of which drafts were outstanding and unpaid on September 26, 1873. That the banking company at North East refuse to be made plaintiffs, wherefore they are made defendants. That Orson Stiles and certain other persons named as defendants were at that time copartners, carrying on a banking business at Fredonia, in Chautauqua county. That the said McKay, on September 26, 1873, executed and delivered to said Nash his bond and mortgage, conditioned to pay said Nash the sum of $10,000, with the interest, at the times therein specified, which mortgage was upon a certain parcel of land in Clymer, Chautauqua county, then owned by McKay, and that said bond and mortgage were executed to Nash for the sole purpose of securing him as the acceptor of the said drafts, and that Nash agreed he would use the bond and mortgage, or negotiate the same, for the sole purpose of raising money to pay the several sums so owing " upon the said drafts;" but in violation of said agreement, " Nash sold and transferred the same to the said Orson Stiles, as trustee, for the said copartnership, composing " The Union Banking Company," at Fredonia. That as such trustee, Stiles has commenced an action for the foreclosure of said mortgage, and obtained a judgment thereon, on which judgment the land is advertised for sale, and the plaintiffs claim that the said bond and mortgage were diverted from the original purpose for which they were made, and the plaintiffs pray the relief that Stiles, as such trustee, be re-

strained from enforcing the said decree of foreclosure, and that the same, or so much thereof as may be necessary, be applied in payment of, or held as security for, the amount due on said drafts.

The persons composing " The Union Banking Company" answered, alleging a *bona fide* purchase of the bond and mortgage for a full and valuable consideration, in September, 1873. That Nash brought the bond and mortgage to the office of the Union Banking Company for sale on September 27, 1873, and represented to said Orson Stiles that he was the sole owner thereof, and that the same were made to him to secure advances previously made by him to McKay ; and that, believing such representations to be true, they advanced to Nash the full amount thereof, partly in the note of McKay, and the balance in cash or its equivalent, and took from him an assignment of the bond and mortgage as security therefor. That in March, 1874, on further representations of both Nash and McKay, to the effect that the said bond and mortgage were given for money advanced to McKay by Nash, and that they were made for the sole benefit of Nash, and confiding in the truth of such representations, the Union Banking Company, on the application of Nash, surrendered to him certain negotiable commercial securities, on which Nash and others were liable, to the full amount of the bond and mortgage, and took an absolute assignment of said bond and mortgage in good faith, and without any notice that the plaintiffs had or claimed any interest therein, or the proceeds thereof. They further allege that Adams Davis, the president of the First National Bank of Corry, Levi A. Skinner, the president of the First National Bank of Westfield, and Alexander W. Blaine, an officer or agent of the banking company at North East, were all made parties to the foreclosure suit, and that said banks had full notice of said suit, but did not appear therein, or in any way set up or make known to the Union Banking Company that they had any interest in the said bond and mortgage, or its proceeds. That the question as to the right of said Nash to negotiate the said bond and mortgage, and appropriate the avails thereof to his own use, was made an issue in the said suit, and was fully tried and determined as between the Union Banking Company and McKay in favor of

said company, which judgment and determination still remains in full force.

They further set up that said Adams Davis, Levi A. Skinner and Alexander W. Blaine, with full knowledge that the Union Banking Company was the owner of said bond and mortgage, received a deed of the premises described in the mortgage, as the agents of their respective banks from the said McKay, for the purpose of securing the said banks, the sums due to them respectively upon said drafts, and that Davis, Skinner and Blaine were duly served with the summons in the foreclosure action which resulted in the judgment in favor of the Union Banking Company.

By stipulation, the case was referred to the Hon. William A. Henderson to hear and determine. He has reported that the Union Banking Company acquired a good title to said bond and mortgage by virtue of the said assignments made thereof to Orson Stiles as president of said company, and that, as against said defendants, the plaintiffs have no legal or equitable claim or title thereto, nor to the proceeds of the sale of the mortgaged premises, which has been had under the said decree, and that the complaint should be dismissed, with costs; and a judgment has been ordered accordingly.

Amongst his other findings of fact, the said referee reports in substance that the drafts in the complaint mentioned, or a portion thereof, being about to fall due, McKay was unable to pay the same and communicated that fact to Nash; and it was then, on September 26, 1873, mutually agreed between the two that, "for the purpose of providing the funds with which to pay and take up said drafts, McKay should make, execute and deliver to Nash, a bond and mortgage for the amount and in the terms' stated." That said Nash . . . should sell said bond and mortgage for cash, and the money so to be received by him therefor should be used and applied by said Nash in the payment of said drafts. It was this consideration that induced the making and delivery of the bond and mortgage by the mortgagor, and the receipt thereof by the mortgagee, and that it was expected by the parties to the said bond and mortgage at the time of its delivery, that it could and would be sold by said mortgagee, to the defendants com-

posing the Union Banking Company, for cash; that on the day following the execution of said bond and mortgage, viz. : on September 27, 1873, the said mortgagee, without the knowledge or consent of the said mortgagor, or of the owners and holders of said drafts, assigned in writing under his hand and seal, the said bond and mortgage to the defendant Orson Stiles, as president of said Union Banking Company, for the use and benefit of said company, as collateral security for the payment to said Union Banking Company, of any and all sums of money then due and owing to said company by said mortgagee, or which said mortgagee should thereafter owe said company, and the said mortgagee at the same time delivered said bond and mortgage to said assignees; that said mortgagee was then owing the Union Banking Company a sum of money much greater than said bond; that at the time of the execution and delivery of the said assignment, the said assignees had no knowledge or information of the purpose for which the said bond and mortgage was executed and delivered as aforesaid, and no knowledge of the existence of said drafts, and the said assignees took said assignment in good faith for the purpose expressed in said written assignment aforesaid, and the said assignees, relying on the said assignment, did at *said time, discount other commercial paper for said Nash to an amount exceeding* $10,000, the proceeds of which were applied in taking up paper previously discounted for said Nash by said assignees, and upon which Nash and other parties were liable. Nash on the same day informed McKay of the disposition he had made of said bond and mortgage.

Furthermore, that in April, 1874, Stiles, as president, purchased from said Nash absolutely the said bond and mortgage, for the use of said Union Banking Company, which said company, in consideration of said absolute sale, surrendered to said Nash, commercial paper, which it had previously discounted for him, and upon all of which Nash and other parties were liable. And that neither of the members of said Union Banking Company had any knowledge or information of the actual purpose for which said bond and mortgage was made and delivered to Nash, or of the existence of said drafts, or of the liability of Nash thereon, but took the absolute assignment of said bond and mortgage, in good faith, believing

Nash to have the lawful right to make such disposition thereof. That "at the time before stated,"—*i. e.*, at the time of the execution and delivery of the bond and mortgage, McKay was indebted to Nash including the acceptances for $10,000, and Nash gave McKay credit for the said bond and mortgage about six months after the same was given. The learned counsel for the appellants is understood to complain somewhat of the findings of the referee upon questions of fact, and we can see that the evidence given by the various witnesses is contradictory, uncertain and somewhat obscure, and often not quite intelligible; but the learned referee, having personally seen and observed the witnesses, knew better than we can know the credit to which they were entitled and how they meant to be understood; and we are not able to say that the report of the referee is unsustained by the evidence in any material particular.

The mortgage was recorded in the office of the clerk of Chautauqua county on September 30, 1873. The counsel for the appellants claim that upon the findings of the referee, the bond and mortgage having been executed by McKay to Nash, for the sole purpose of raising the money wherewith to pay the drafts mentioned in the complaint, that the plaintiffs and the banking company at North East are entitled to reclaim from the Union Banking Company the bond and mortgage or the proceeds thereof, although it does not appear that they ever knew of the trust created in Nash, much less that they in any manner acquiesced in or assented to the same. This might be so, except for the doctrine of *estoppel in pais*, as applicable to the facts in the case.

It is said by the chancellor in *Curtis* v. *Tyler* (9 Paige, 432), "It makes no difference that such principal creditor did not act upon the credit of such security in the first instance, or even know of its existence."

The contention of the appellant's counsel rests upon the general principle that the assignor of a chose in action not negotiable, can only transfer the interest he has in the instrument, and the purchaser only takes such interest as his assignor had to part with, and in support of his views of the case the counsel places much reliance on the cases of *Bush* v. *Lathrop* (22 N. Y., 535), *Greene* v.

*Warnick* (64 N. Y., 220), and *Trustees of Union College* v. *Wheeler* (61 N. Y., 86.) But the case of *Bush* v. *Lathrop* is overruled upon the point under consideration—the effect of the doctrine of estoppel. Judge EARL says, in delivering the opinion of the court, in *Greene* v. *Warnick (supra)*, page 225; " Under the authority of the case of *Moore* v. *Metropolitan Bank*, Noble ought to have been held estopped from asserting his title to the bond and mortgage in consequence of his absolute assignment of the same, by which he conferred the apparent ownership upon Preston and apparent authority to sell, and so, for the decision of that case (*Bush* v. *Lathrop*), must now be considered to have been erroneous."

The case of *Trustees of Union College* v. *Wheeler*, decided by the Commission of Appeals, which holds that the assignee of a bond and mortgage takes, subject not only to latent equities of the mortgagor, but of third persons having an interest in the mortgaged premises, must be considered to have been decided upon the peculiar circumstances of that case, and does not purport to disagree with the cases which hold the contrary, where the principle of estoppel is applicable. On the contrary, the doctrine in *Moore* v. *Metropolitan Bank* (55 N. Y., 41), is in the opinion of DWIGHT, Commissioner, alluded to on a motion for reargument in the Union College case, where he says, at page 114: " The point in *Moore* v. *Metropolitan Bank* is simply whether the law of estoppel is applicable on the question of title, as between a first assignee and a remote purchaser of a non-negotiable *chose in action*. It is held that it is. The rule that the *chose in action itself* is open to all defenses growing out of the original transaction, in the hands of any assignee no matter how remote, remains unshaken, and must continue so until elementary rules of law are overthrown."

It is held in *McNeil* v. *Tenth National Bank* (46 N. Y., 325), that "where the owner of property confers upon another an *apparent title* to or power of disposition over it, he is estopped from asserting his title as against an innocent third party who has dealt with the apparent owner in reference thereto without knowledge of the claims of the true owner. The rights of such third party do not depend upon the *actual* title or authority of the one with

whom he dealt, but upon the act of the owner, which precludes him from disputing the title or authority he has apparently conferred." . . . If the owner intrusts to another, not merely the possession of the property, " but also written evidence over his own signature of title thereto, and of an unconditional power of disposition over it, the case is vastly different. There can be no occasion for the delivery of such documents, unless it is intended they should be used, either at the pleasure of the depositary or under contingencies to arise. If the conditions upon which this apparent right of control are to be exercised are not expressed upon the face of the instrument, but remain in confidence between the owner and depositary, the case cannot be distinguished in principle from that of an agent who receives secret instructions, qualifying or restricting an apparently absolute power."

The facts of this case seem to bring it precisely within the principle laid down by Judge RAPALLO in the case last cited, but the case is criticised by stating that it related to the title to corporate stocks, to which some decisions have given a *quasi* negotiable character. But afterwards, in the case of *Moore* v. *Metropolitan National Bank* (55 N. Y., 41), the Court of Appeals, in an opinion delivered by GROVER, J., applied the same principle to all non-negotiable choses in action, and it was then held that " A *bona fide purchaser for value of a non-negotiable chose in action*, from one upon whom the owner has by assignment conferred the apparent absolute ownership, when the purchase is made upon the faith of such apparent ownership, obtains a valid title as against the real owner, who is estopped from asserting title in hostility thereto." And the case of *Bush* v. *Lathrop* is again expressly overruled, so far as it neglects to notice and apply the principle of estoppel to the case. See also *Dillaye* v. *Commercial Bank of Whitehall* (51 N. Y., 345), in commenting on which, in the Union College case, DWIGHT, Commissioner, says, at page 106: " The point was, whether one who held a mortgage in trust, with an apparently unrestricted power of disposition, could transfer it free from the the claims of the *cestui que trust* to a purchaser in good faith. It was held that he could."

In the case at bar, the plaintiffs, to take the most liberal view of

their equitable rights, were no more than *cestui que trusts*, of the mortgage, or its proceeds, according to the agreement between the mortgagor and mortgagee, and no evidence of any such trust or interest appeared upon the face of the papers, or was in any manner communicated to the Union Banking Company. But it is insisted by the appellant that if the doctrine of *estoppel in pais* can be in this case applied to Nash and McKay, it cannot affect the rights of the plaintiffs, because their rights in equity attached to the mortgage when it was delivered to Nash for the purpose of raising money upon it to pay the drafts in question. So, also, did the rights of the *cestui que trust* in the case of *Dillaye* v. *Commercial Bank of Whitehall.*

But in this case the estoppel was created by the very form of the mortgage itself, purporting to be a mortgage from McKay to Nash founded on a valid consideration, and with no other condition but for the payment of the money by McKay. The plaintiffs claim under that mortgage, and so claiming, they can neither repudiate its form or the legal consequences which followed from the circumstances that it was apparently a mortgage from McKay to Nash, subject to no condition other than the payment of the money purporting to be secured by it to Nash. Having no other claim against the defendants than by and through this mortgage, the vice is in the plaintiff's own title. The instrument under which the rights of the plaintiff are claimed to arise is the very same which constituted the estoppel, and which held out the pretense that it was made solely to secure the payment of a debt to Nash, and if the plaintiffs were now permitted to deny that such was the fact it would enable them jointly with McKay to perpetrate a fraud upon the defendants, the assignees, from which it is the office and object of the doctrine of estoppel to protect the purchaser in good faith and for value.

The complaint in the foreclosure suit is not set out in the case, and it does not appear that Davis, Blaine and Skinner were made parties, as in any manner representing their respective banks. No further attention is, therefore, paid to so much of the defense as is claimed to be founded on the estoppel by record of the judgment in the foreclosure case.

We think in the light of the modern decisions the referee came to the correct conclusion on the facts found by him.

Judgment affirmed, with costs of appeal, to be paid by the appellants.

Present—Talcott, P. J., Smith and Hardin, JJ.

Judgment affirmed, with costs.