THE BOARD OF EDUCATION of Union Free School District No. 1 of the Town of Waterford, Appellant, *v.* THE FIRST NATIONAL BANK of Richfield Springs, JOHN D. HENDERSON, as Receiver, etc., RICHARD J. WILLIAMS and EDWARD MANOGUE, Appellants; and ALEXANDER G. CUNNINGHAM, Respondent, Impleaded with JOHN BROWN and Others, Defendants.

*Building contract — architect's estimate — non-negotiable chose in action — equitable estoppel.*

A building contract, for the erection of a school building for the board of education of a union school district, provided that "in the event of any doubt or question arising respecting the true meaning of drawings or specifications reference shall be made to the architects, whose decision thereon, being just and impartial, shall be final and conclusive." The contract price to be paid as follows: "On or before the 10th day of each month ninety per cent of the work done and material furnished during the month previous; the full amount of work done and material so furnished to be ascertained by the estimate of the architect."

The specifications provided that the work should be done to the satisfaction of the architect and building committee, and that "any disagreement that cannot be settled by the architects or building committee shall be settled by three disinterested arbitrators."

*Held,* that while, under these provisions, the contractors before they could demand monthly payments were required to obtain, if practicable, the architect's estimate, yet that it was apparent that the parties contemplated that in case either the contractors or building committee were dissatisfied the disagreement should be settled by arbitration, and that this provision precluded the conclusion that the architects were made final arbitrators or umpires or that their decision was final and conclusive as to monthly estimates of the value of the work done and material furnished during the progress of the work.

When a paper claimed to be an architect's estimate of work done under a building contract, which by its terms does not make such an estimate conclusive even when honestly made, purports simply to be an "approximate" estimate

and is shown to have been made in bad faith, evidenced by mistakes so gross as to characterize the estimate as a fraudulent one, it is worthless for any purpose in the hands of the contractors.

Nor does such an architect's estimate have any greater force in the hands of an assignee thereof from the contractors, on the ground of equitable estoppel as against the party obligated to pay for the work done under the contract, where the estimate was not intended to influence the conduct of any outsider, and the building contract did not clothe the architect with any authority to make any statement to any third party or to the public at large, and it was not contemplated by the building contract or by any previous dealings between the parties that the estimate should be put upon the market or be used as negotiable paper or security or be dealt with in any manner by the public or by any member of it.

Such assignee thereof stands in the shoes of the contractors to whom the estimate was furnished, and holds the claim subject to all the defenses and equities which might be urged against the contractors.

APPEALS by the plaintiff, the Board of Education of Union Free School District No. 1 of the town of Waterford, and by the defendants, the First National Bank of Richfield Springs, John D. Henderson as receiver, etc., Richard J. Williams and Edward Manogue, from a judgment of the Supreme Court, entered in the office of the clerk of Saratoga county on the 7th day of January, 1893, upon a decision of the court rendered after a trial before the Saratoga Circuit Court without a jury.

*C. C. Ormsby* and *J. W. Houghton,* for the plaintiff appellant.

*James W. Verbeck,* for the First Nat. Bank, Williams & Manogue and Henderson, defendants appellants.

*Smith & Wellington* and *Edgar T. Brackett,* for the respondent.

HERRICK, J.:

From an examination of the evidence in this case I am satisfied that there is evidence tending to establish the facts found by the trial court, and I do not feel that I would be justified in saying that such facts are not supported by the evidence in the case.

The facts found by the court not being disturbed the conclusions of law found naturally follow.

The opinion of the trial court is in the main satisfactory, and I see no reason to write another.

Judgment should be affirmed, with costs.

MAYHAM, P. J., and PUTNAM, J., concurred.

Judgment affirmed, with costs, on the opinion of court below.

The following is the opinion of the trial court:

KELLOGG, J. :

This action is brought, as appears by the complaint, to have determined to whom, among the defendants, plaintiff should pay money in its possession, and the amount to be paid to each. The apparent theory is that a certain sum of money is, by order of the court, deposited with the county treasurer, subject to distribution among the defendants by judgment of this court, the plaintiff being only interested in properly and safely being rid of the money and all liability to any defendant; that the defendants should litigate among themselves their rights thereto. The answer of the several defendants, and the course the litigation has taken, develops a somewhat different theory, which may also be considered consistent with plaintiff's right to maintain the action, viz. : To whom among defendants is plaintiff indebted, and in what sum or sums ? Various independent claims have by the several defendants been made upon plaintiff, all growing out of a single transaction. One suit is pending by defendant Cunningham against plaintiff, claiming the entire sum in plaintiff's possession. Another is threatened by defendant, the Richfield Bank, claiming a portion of such money, and sundry proceedings supplemental to execution in favor of other defendants are also pending, liable to ripen into several actions in the name of the receiver of John and Charles Brown (two other defendants) against the plaintiff. And while the sum of plaintiff's total indebtedness is conceded to be a limited sum, and its present obligation to each and all of the defendants is based on a single contract made with defendants John and Charles Brown, and not upon its separate dealings with other defendants, yet the plaintiff is in peril from these various claims, and I think properly brings into court in one suit all these defendants, and is entitled to judgment here determining all questions raised. Objection is made by no defendant

except defendant Cunningham, to this mode of procedure.   There is no difficulty in making a full determination of all the questions in a single action.   In such an action all matters of fact might properly be left to a jury, if a jury were insisted upon; and even if a jury trial were denied, I am of the opinion that that theoretically great injustice to the litigant is outweighed by the threatened vexatious litigation and expense attending a denial to plaintiff of standing in court in such an action.

The whole controversy grows out of a contract made by plaintiff in March, 1891, with defendants John and Charles Brown, to build a school building in the village of Waterford for $32,000.   The contract is in writing.   The contractors entered upon performance promptly, but before completion, and on November, 15, 1891, abandoned the work, and without excuse or pretense of excuse refused to further perform.   And defendant Cunningham, who was one of the sureties on the contractors' bond, and was also assignee of the contract from John and Charles Brown after the abandonment, completed the building after the manner prescribed by the contract. The contract stipulated for payments of ninety per cent monthly as the work progressed.   At the time of the abandonment by the Browns they had been paid in money by plaintiff $23,271.54. Extra work had been done of the value over certain proper deductions, of $256.17; and after the above-named payments the plaintiff at time of abandonment had in hand to pay for balance of work and material to complete the building exactly $8,984.63.   This was what plaintiff would have to have paid the Browns had they gone on and completed the building.   About this there is no dispute ; and this was known to Cunningham when he took his assignment from the Browns of the contract, and when he first began work after Brown left.   It is clear, I think, from the position taken by Cunningham from the beginning, that he never had other expectation than to be paid out of that balance in plaintiff's hands, and no sum in excess of it, however much the completion of the building might cost him.   This, from his actions and conversations, the plaintiff had a right to understand.   And the claim of counsel for this defendant made at the close of this case that the facts warrant a judgment upon a *quantum meruit* for the value of labor and materials in completion of the building by Cunningham and in excess of

the sum in hand, and without regard to the contract or to the payments actually made to the Browns, is untenable.

If Cunningham were the only party in interest here obviously all that would be necessary in disposing of the case would be the ascertainment of the sum in the hands of the plaintiff unpaid upon the contract, and direct the payment of such sum (with interest from the time when due) to him; but the interest of the other defendants, if any they have, is in the sum due the Browns at the time of abandonment over and above the sums paid to them by plaintiff, and the plaintiff not seeking to claim any forfeiture by reason of the abandonment, investigation was largely directed to the determination of this question, to wit: The actual value of the labor and materials furnished by the contractors, John and Charles Brown.

The testimony is practically undisputed that the contract price, $32,000, was a fair and reasonable estimate of the cost of construction of the building in accordance with the terms of the contract. It may also be regarded as undisputed that the actual and necessary cost of finishing the building after the Browns left it was $10,941.09. Evidently the only accurate test of the value or cost of the unfinished building at the time the contractors left it, is the contract price less cost of completion. This test is eminently more satisfactory than any judgment of architects or builders as to value of work and materials furnished by the Browns prior to their departure. From this it appears beyond question that instead of there being anything owing the Browns when they left, that they had been largely overpaid in money by the plaintiff for all they had furnished and done. This proof also established that after Cunningham is paid, there will be nothing in plaintiff's hands for the Browns or any of the defendants claiming under them, or either of them; for this cost of completion in the sum of $10,941.09 was wholly borne by Cunningham.

It is contended, however, by the defendant, the Richfield Bank, that plaintiff is estopped from denying that it owed to the Browns on November 15, 1891, in excess of the money already paid them the further sum of $3,500, and this contention is based upon these facts, viz.:

The written contract for the construction of this building possesses the following language:

"The contractors shall and will well and sufficiently perform and finish under the direction and to the satisfaction of said George C. Adams and W. P. Regan, architects, as aforesaid (acting as agents of said owners) all the work included in the specifications   \*   \*   \* according to the true intent and meaning of said drawings and specifications and of these presents.   \*   \*   \* and in the event of any doubt or question arising respecting the true meaning of drawings or specifications, reference shall be made to the architects, whose decision thereon, being just and impartial, shall be final and conclusive \*   \*   \* (the contract price, $32,000) to be paid as follows: On or before the 10th day of each month ninety per cent of the work done and material furnished during the month previous. *The full amount of work done and material so furnished to be ascertained by the estimate of the architect.*"

The specifications provide that the work shall be done to the satisfaction of the architect "and building committee" and "any disagreement that cannot be settled by the architects or building committee shall be settled by three disinterested arbitrators."

It is the contention of counsel for the bank that the architects or architect were made by this language final arbitrators or umpires, and that their decision on any matter was final and conclusive, and that this is especially so as to monthly estimates of value of work done and material furnished during the progress of the work. Without doubt the contractors before they could demand monthly pay were required to obtain (if practicable) the architect's estimate. (*Wyckoff* v. *Meyers*, 44 N. Y. 145.) But I think it is contemplated by the parties that in case either the contractors or building committee were dissatisfied, the "disagreement shall be settled by arbitration," and this provision destroys the claim of conclusiveness to such estimates, in any event. It appears that on the 15th of November, 1891, the architect Regan made what purported to be an estimate of all the work done and material furnished up to that time from the beginning. That such estimate was made under the supervision of John Brown, the contractor; and, in addition to showing the value of such work and materials to be $29,252.51, also showed the amount paid Brown, viz., $19,171.54; and after deducting ten per cent, found a balance due of $7,155.72. This pretended estimate is all in the handwriting of one Carroll, clerk of the contractors, and

has across its face the name of " W. P. Regan," signed by the archi-
tect. This estimate purports on its face to be " an approximate esti-
mate for work done on Waterford school to date." When made,
the paper was handed by the architect to John Brown, who took it
on the same day (November fifteenth) to the chairman of the building
committee, Mr. Ford, who immediately expressed dissatisfaction,
and declared the estimate grossly excessive, and refused to pay more
than $3,500 thereon. Such sum was paid to and received by
Brown, and the paper left with Ford for the plaintiff. This seems
to have been a settlement of this dispute without the intervention of
arbitrators.

It is shown upon the trial that this estimate was, as stated by the
building committee to Brown, grossly excessive; that the error was
so great as to characterize it as made in bad faith, and fraudulent.
That instead of the value of the work and material being $29,252.51,
its value was not, in fact, over $21,058.91. After receiving the
$3,500 on this estimate from the building committee, Brown returned
to the architect, Regan, and procured from him another paper, simi-
lar in all respects to the one left with the building committee, except
across its face was written by Regan: " The above is approved by
George C. Adams and W. P. Regan, architects, per W. P. Regan,
Lawrence, Mass."

This was signed by Regan, at Brown's solicitation, after being told
of the conclusion of the building committee, and of the refusal to
pay the full sum of $7,155.72; and so signed to enable said Brown
to procure the money elsewhere, and not for the information of
either the plaintiff, its building committee or the contractors, or to
enable the contractors to procure money from the plaintiff under
the terms of the contract. It cannot be claimed, nor does counsel
for the bank claim, that such a purpose (the issuing of estimates to
procure money elsewhere) was contemplated by the parties in the
language of the contract, or through any dealings between them
thereunder.

This second paper was, taken by Brown to the defendant — the
Richfield Bank — a long distance from Waterford — and on the 17th
of November, 1891, after the contract had in fact been abandoned,
and used with said bank as collateral security to a note; and a loan
of $3,500 was procured from the bank thereon. The bank made no

inquiry of anyone but Brown; had no knowledge of the terms of the contract, or of the authority of the architect, or the reasons of refusal of payment by plaintiff. The plaintiff knew nothing of this transaction, and was ignorant of the acts and intentions of the architects and said Brown respecting the second paper.

It is under this state of facts that the bank now claims that the plaintiff is estopped from denying that it owed this $3,500 to Brown on November 15, 1891.

In the hands of the contractors, it needs no argument to convince that this paper purporting to be an estimate would have been valueless as the basis of a claim against the plaintiff. The architect's estimate is not conclusive under the terms of this contract, even when honestly made; and when it purports simply to be an "approximate" estimate, it does not profess to fix the exact amount; and when the "approximate" estimate is made in bad faith, evidenced by mistakes so gross as in this case as to characterize the estimate as a fraudulent one, it is sufficient to destroy it for any purpose in the hands of the contractors. (*Kihlberg* v. *U. S.*, 97 U. S. 398; *U. S.* v. *Robeson*, 9 Pet. 319; *Smith* v. *Briggs*, 3 Den. 73; *McMahon* v. *N. Y. & E. R. R. Co.*, 20 N. Y. 464; *Smith* v. *Brady*, 17 id. 174; *Butler* v. *Tucker*, 24 Wend. 447; *Whiteman* v. *Mayor*, 21 Hun, 118.)

As an "award" the essential elements are lacking, authorization, exactness and honesty.

In the hands of the defendant, the Richfield Bank, it is difficult to see how this paper can have greater value than if possessed by the Browns, or how the principle of equitable estoppel can be invoked in its aid. When a person has made a deliberate statement with a view to induce another to act, he may not be at liberty to deny the statement so made, but it must be a statement to or some neglect of duty to the person led into that belief, or, what comes to the same thing, to the general public, of whom the person is one, before the benefit of the doctrine of estoppel can be claimed. When the declaration or statement is not made to the person directly, it must have been made under such circumstances as to indicate that it was intended to reach third persons, or the community at large. And the person claiming the benefit of the principle must show that he has acted in the transaction in which he was deceived with ordinary caution.

The plaintiff here made no statement to the bank directly, nor any statement to the general public. It did not clothe the architect with any authority to make any statement to any third person or to the public at large. It is not contemplated by the contract or by any previous dealings between plaintiff and the contractors that the estimate should be put upon the market, or be used as negotiable paper or as security, or that they should be dealt with in any manner by the public or by any member of it. These estimates were simply to be used as the measure of money to be handed out from the school board treasury monthly to the contractors on presentation, when the correctness of the estimate was not disputed. These estimates were never intended to influence the conduct of any outsider; and any such made and paid out by the aid of the architect were unauthorized and not the act or declaration of the plaintiff.

In *Mechanics' Bank* v. *N. Y. & N. H. R. R.* (13 N. Y. 600), certificates of railroad stock issued by the transfer agent of the company were held not to partake of the character of negotiable instruments, and must be taken subject to all equities existing against the assignor, and as to such the doctrine of estoppel *in pais* was not applicable.

The same was held respecting a chose in action not negotiable in *Bush* v. *Lathrop* (22 N. Y. 535). The same in effect is held in *Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co.* (106 N. Y. 195).

This was a delivery by the agent of a common carrier of a bill of lading. The court places great stress upon the fact that bills of lading not stamped "non-negotiable" were declarations by the common carrier to the general public, and any person might safely rely upon the statements therein contained. That this was so understood by the common carrier, and by the consignor and by the business world, and it was because of this recognized element in bills of lading that the court held that the principle of estoppel applied when these fell into the hands of innocent parties.

The reasoning of SELDEN, J., in *Farmers & M. Bank* v. *Butchers & D. Bank* (16 N. Y. 141), is to the same effect.

Statements may be made by a party which are not intended to influence the actions of others or intended to be communicated to them, and in such case the doctrine does not apply. (See *Reeves* v. *Kimball*, 40 N. Y. 311; *Mayenborg* v. *Haynes*, 50 id. 675.)

Here it was held that a declaration of A. to B., not made for the purpose of being communicated to C., constitutes no estoppel, although C. hears of it and acts upon it.

To the same effect is *Maguire* v. *Selden* (103 N. Y. 642).

As to such statements it was here held, that "however understood, (they) could not be extended beyond the party to the transaction in relation to which they were made."

It is unnecessary to continue citations of cases in the courts. The bare statement of the facts is sufficient when once the principle of estoppel here invoked is clearly understood. Without doubt the Bank of Richfield must stand in the shoes of its assignor of this chose in action, and hold the claims subject to all the defenses and equities which might be urged against the Browns.

That the other defendants can have no claim against the plaintiff, since it was found that there was nothing due the Browns at the time of the abandonment of the contract, is too plain for argument. They possessed no legal or equitable claim upon this sum in the hands of the plaintiff, all of which was required to complete the building. They made no contract with plaintiff, and must be relegated to the persons with whom they dealt — the contractors, John and Charles Brown.

The plaintiff contends that it should not be chargeable with interest or costs. The justice of this claim I do not fully see. Nor do I regard the nature of this action so far a presentation of equitable claims as to be addressed to the equity side of the court wherein costs may be a matter of discretion; and if it were I see no propriety or justice in the retention of the money which should have been promptly paid for the completion of the building. The facts of this case do not press the court with any considerable force to the conclusion that plaintiff was justified in not paying over the money to Cunningham promptly, and in accordance with the terms of the contract. This might have been done safely, and it was clearly plaintiff's duty to have done it. In no respect is Cunningham at fault; and why he should suffer this delay and lose both interest and costs after a long and expensive struggle, is not quite plain, and the justice of this claim of plaintiff does not gain weight upon reflection that really there has been nothing to struggle

over. The whole claim of Cunningham has been conceded from the beginning except the amount, and a proper resort to the contract and the architect at the time might have obviated any disagreement, and the amount have been promptly determined through means in plaintiff's reach.

The delay caused by plaintiff to the completion of the building was, in the light of this trial, wholly inexcusable. The plaintiff was called upon to decide, and to act promptly. It had open to it two courses. It might declare the contract forfeited, and assume the completion itself, or it might recognize the contract as continuing, and accept the offices of the surety, or accept the assignment as satisfactory, and recognize him. It did neither. Cunningham acted only the part of a prudent man, spending so much time in seeking recognition, and seeking so to avoid the peril of doing his work for nothing. This delay must be charged to plaintiff, and since it was sufficient to excuse the delay in completion of the building beyond April first, it must be sufficient to relieve from the stipulated forfeiture.