# BALTIMORE CITY COURT

Filed May 15, 1893.

Opinion of Judge Wright in passing upon the prayers in the case.

## ROBERT H. RENSHAW
### VS.
## THE GERMAN SAVINGS BANK OF BALTIMORE.

*Brown & Brune* for plaintiff.

*Benzinger & Calwell, John Pentland Brown, Alfred S. Niles* and *Bernard Carter* for defendant.

WRIGHT, J.—

I have come to the conclusion that unless the alleged custom, of which evidence has been offered in this case, has been shown to be not only uniform, but also reasonable and certain, the defendant stands simply in the position of one who has taken by way of pledge a non-negotiable security, and in that case it took the securities subject to whatever equities existed between the Messrs. Nicholson and the plaintiff. All of the cases that I have examined where second pledges have been permitted to claim the amount due from the pledgor to the first pledge have been cases where the position of the pledgor was not changed from that in which he had intended to place himself by his contract with the pledgee. If the pledgee had rehypothecated the pledge for a larger amount than that for which it had been pledged to him the pledgor could recover his pledge by paying to the second pledgee the amount due the first pledgee. The situation of the pledgor was not changed from that in which it was his original intention to place himself, and this was the only equity he had the right to insist upon. On this principle alone

it seems to me can the cases, cited by counsel and others, independently examined by me, be at all reconciled, or sustained.

It is necessary first therefore to decide whether or not there has been shown in this case a binding and valid custom, which should bind the plaintiff without knowledge of the same in his dealings with the Nicholsons. To show such a custom there must not only be evidence that it is certain, uniform and notorious, but also that it is reasonable.

What is the custom alleged here? It is that when a purchaser from a broker of stock on margin deposits with the broker other stock as collateral, the broker has the right to repledge the stock in order to raise the money necessary to carry the stock so purchased. Were this all that is claimed for the custom by the witnesses by whom it was attempted to prove it, and should there have been sufficient proof to show that it was uniform and notorious, I should, under the views that I have, have had little hesitation in declaring it a valid and binding one. But the proof of what the custom is goes much farther. It shows that the alleged custom not only permits the broker to pledge the collaterals or "margins," for the specific amount due the broker by the purchaser as an advance, but to pledge it on account of a much larger loan, to bunch the securities with other securities belonging to other parties, and to pledge the whole of these different securities for this loan greatly in excess of the amount owing for margins by the purchaser. It is true that as a matter of accommodation the lender usually permits the withdrawal of securities and the substitution of others satisfactory to him, but there is absolutely no proof that by any custom the broker has any positive acknowledged right to do so, and strictly speaking the lender has by this usage the right to hold all of the securities pledged for the whole amount thus borrowed.

It was very ingeniously argued by the counsel for the defendant that these incidents were not strictly a part of the custom, but acts done outside of and beyond the custom, and the custom was simply one that gave the right to hypothecate to the extent of the per centage of margin agreed upon. Were this so, the defendant would not be benefitted, for if one claims a right under a custom and goes beyond the bounds of that custom, he cannot claim to be acting in acordance with it. A man is not bound to act under a custom; he may show that his intention is not to be governed by it, and that intention will most conclusively be shown by acts and conduct inconsistent with the custom. But I do not think the position a correct one. The evidence shows that this practice was believed to be justified by the custom, or else it shows such a difference of opinion among the expert broker witnesses as would deprive the custom of any semblance of uniformity. I do not see how it is possible to thus divide up a custom, retaining some of its features and casting others aside that may be unreasonable, and still maintain that it is a valid, uniform custom.

Is then this alleged custom in any reasonable sense a reasonable one? Can it be held reasonable that the purchaser of securities on margin should be placed in such a position that he would not have the absolute right to demand securities which he had pledged for a certain sum, unless he should pay a much larger sum? I think not. I see too many grounds for unreasonableness to hold this to be a legal binding custom, even were there a legal sufficiency of evidence as to its uniformity, which I think there is not. The alleged agreement of the defendant with the Nicholsons to permit them to withdraw securities on the substitution of others satisfactory to its cashier or officers does not help the defendant's case. The risk imposed upon the purchaser resulting from the possible inability of the broker to substitute other "satisfactory" security; the doubt as to what would be deemed satisfactory, does not place the purchaser in a position in which he has a right to claim to be placed. His securities should be in that position, that upon paying the amount due on his purchase, he would have the right to demand and obtain them, entirely regardless of what other amounts might be due by the broker, and regardless too of the fact whether the broker might be able to substitute in place of his securities others that would be satisfactory to the lender.

362

Has then (there being no legally binding custom shown) the conduct of the plaintiff been such that he is estopped from claiming the value of these securities?

The rule of estoppel as applicable to these cases is formulated thus by Mr. Pomeroy in Vol. 2, Sec. 710, of his work on Equity Jurisprudence: "The owner of certain kinds of things in action not technically negotiable, but which in the course of business customs have acquired a semi-negotiable character in fact, may assign or part with them for special purpose, and at the same time may clothe the assignee or person to' whom they have been delivered with the apparent *indicia* of title and instruments of complete ownership over them and power to dispose of them, as to estop himself from setting up against the second assignee, to whom the securities have been transferred without notice and for value, the fact that the title of the first assignee or holder was not perfect and absolute." The author continues, "The ordinary and most important application of this rule is confined to the customary mode of dealing with stocks." This rule, Mr. Pomeroy says, may be considered as established, and if in the pending case Nicholson had made an absolute sale to the defendant, there would be no difficulty in the way of its application here. The authorities cited by Mr. Pomeroy lay down certain conditions that must be considered when the question of *apparent indicia* of title is under' consideration. In the leading case of McNeil vs. Tenth National Bank, 46 N. Y. 325, Mr. Justice Rapallo, in a very able opinion, considers this question and cites with approval the language of Mr. Justice Denio in Bush vs. Lathrop, 22 N. Y. 535, where he says: "The mere possession of chattels, by whatever means acquired, if there be no other evidence of property or authority to sell from the true owner, will not enable the possessor to give good title. But if the owner intrusts to another not merely the possession of the property, but also written evidence over his own signature to the title thereto, *and of unconditional power of disposition over* it the case is vastly different."

Did the plaintiff here under the decisions of our Court of Appeals intrust Nicholson with "written evidence

over his own signature of title thereto, and of unconditional power of disposition over it?" I think this question of necessity compels me to discover what construction, if any, has been placed on an instrument of the character exhibited in this case by our Appellate Court, and this I am bound to say we discovered in the Taliaferro cases. I agree with the defendant's counsel in their view that the Taliaferro cases do not have in all respects decisive effects on the pending case, claimed by the plaintiff, but, while agreeing with them in that respect, there is no doubt in my mind that those decisions are conclusive so far as the construction of the instrument itself is here involved. Says the Court in the construction of an instrument almost if not absolutely identical with the instrument before us, "The very face of the instrument shows that it authorized the attorney to bargain and sell, but not to pledge for debt. *Any one taking this instrument must necessarily see this.* A power to sell does not authorize the agent to pledge for his own debt the thing which he is employed to sell." I only quote this to show that this instrument does not, in Maryland at least, give evidence of unconditional power of disposition," and without such evidence there is no estoppel from the character of the instrument.

Having concluded then that there is no custom shown to affect the right of the plaintiff to recover, and no estoppel, the next and last question I deem it necessary to consider is, that if the plaintiff has the right to maintain this action, what can he recover, and can the defendant recoup to the extent claimed by him, or to any extent. The fifth prayer of the defendant is framed on the theory that at the common law and independently of any alleged custom, the pledgee of securities such as those in dispute here, has the right to repledge such securities, at least, to the extent of his own lien or claim, and that the second pledgee cannot be made answerable for the value of the securities unless the first pledgor pays the amount of the debt due to the original pledgee, for which debt the securities were originally pledged. This question has embarrassed me much more than any of the other questions presented, but with the best light I

can now get on the subject, I am quite satisfied that the trouble has arisen from the fact that there has in all the cases examined by me on this point been a well ascertained debt due, and that the payment of that debt was the only subsisting equity to be considered on behalf of the original pledgor. We may admit the doctrine to be law and still find that there was no intention on the part of the Courts to say that there might not be other subsisting equities besides the mere payment of a sum advanced by the first pledgee. In Talty vs. The Freedman's Bank, 3 Otto 321, the Supreme Court approves of the doctrine contended for to the extent I suggest, and quotes from Story on Bailments as follows: "But if the pawnee should undertake to pledge the property (not being negotiable securities) for a debt beyond his or to make a transfer thereof, as if he were the actual owner, it is clear, that in such case he would be guilty of a breach of trust and his creditor would acquire no title *beyond that held by the pawnee.*" Without going into the question as to whether the doctrine approved by the Supreme Court be law, or its opposite, as maintained by many strong authorities, and by Cook and the learned Annotator of the Lawyers' Edition of the Supreme Court Reports, I would say that taking the statement from Story as the foundation of the doctrine, still I do not think it applicable to the facts of this case, the lender here, we will say "acquires no title beyond that held by 'the Nicholsons'." Their title was that of a pledgee bound by the obligations of a certain contract entered into between themselves and the plaintiff. That contract bound them to carry on margins of ten per cent. certain stocks purchased by them for the plaintiff; that contract bound him to protect the plaintiff's property and interest until the carrying contract had terminated in a fair and proper manner, either by mutual consent or otherwise. While under this contractual obligation he pledges the stock of the plaintiff, without his knowledge, with other securities, as collateral for a debt that the plaintiff did not owe. Some time after this he becomes insolvent and the plaintiff for the first time discovers that all that Nicholson had been carrying for him and all that he had placed

with him as collateral had been swept away; the contract he had made with the Nicholsons violated and all of his securities gone.

Did Nicholson's title authorize him to place the property of the plaintiff in any such position? Was he not bound to use the property in accordance with his contract, and to so arrange it that the plaintiff might get his rights, notwithstanding the pledgee's mishap? Was there not an equity of the plaintiff entirely outside of and beyond the comparatively small sum of ten per cent. or thereabout for which he was liable? I think the answer must be in the affirmative. If then in violation of his duty the conduct of Nicholson leads to heavy loss on the part of the plaintiff, should not the recovery of that loss to the extent of the collateral security deposited by him be allowed him, and should it not be treated as a just subsisting equity between the second pledgee and the original pledgor, when under the language of our Court of Appeals "the very face of the instrument shows that it authorized 'Nicholson' to bargain and sell and not to pledge for debt, and that any one taking it must necessarily see this?" Does not the Court intend by this language that when a party approaches another to obtain a loan and offers to pledge security which by the power attached is to be sold, the party thus approached must inquire as to the rights of the original pledgor, whose name is on the certificate? And had he inquired, would he not have seen that these certificates were bound up in a running, open contract and could not be placed beyond the control of the Nicholsons, and if they were by fraud or mishap of Nicholson lost to the plaintiff, the holder might be bound for their value? I think that the equities of the plaintiff under the circumstances of this case were those existing to the end, when the contract was violated by the Nicholsons to heavy loss of the plaintiff.

Again, I should be inclined to agree fully with the doctrine laid down in the Freedmen's Bank case in 3rd. Otto where the facts of the case are substantially similar, still I am constrained to say that I think that under the facts of the pending case there are other principls of the law that prevent

here its applicability. There is a very marked difference between the facts in the case in 3rd. Otto and other cases that follow that case and the facts developed here. The pledgee, Nicholson, did not rehypothecate all of the securities to one party for the amount borrowed by him on the hypothecated securities; he divided them up, borrowed one amount from one party and another amount from another party, dividing the securities after mingling them with the securities of others, between the different lenders.

Now, under the whole contract between Renshaw and Nicholson, it can hardly be contended that there is any evidence that the debt of Renshaw was to be considered anything but *one* debt, whatever might be due on margins at any time was to be considered an entire debt; at least, there is not the slightest evidence that they at any time treated it as divided up into separate obligations.

There can also be little doubt that if after the said rehypothecation to different parties, Renshaw should now be compelled to seek out and make a tender to each of these parties, it would be nothing more nor less than compelling a debtor to submit to a part assignment of his debt by the more *ipsi dixit* of the creditor. Does this power exist in law? Mr. Brantley in his recently published admirable work on the law of contracts (p. 170) says, "At law an assignment of part of a debt cannot be enforced against the debtor by the assignee unless the debtor assents to the same. He cannot be compelled to pay an entire debt in parts," and he cites as authority for this proposition Gibson vs. Finley, 4 Md. Ch. 75, note, and Carter vs. Nichols, 58 Verm. 553. In the note to Gibson vs. Finley, we find a quotation from Mandeville vs. Welsh, 5 Wheat. 285, the latter part of which is as follows: "The reason of this principle is plain. A creditor shall not be permitted to split up a single cause of action into many actions, without the assent of his debtor, since it may subject him to many embarrassments and responsibilities not contemplated in his original contract. He has a right to stand upon the singleness of his original contract, and to decline any legal or equitable assignments by which it may be broken into fragments. When he undertakes to pay an integral sum to his creditor, it is no part of his contract that he shall be obliged to pay in fractions to any other persons." This ruling of the Supreme Court is approved in Gibson vs. Finley and in Wilson vs. Carson, 12 Md. 74.

I have very earnestly considered whether there is any legal principle that would prevent the application of this doctrine to this case, and I have been unable to discover any. Forcing a debtor to pay part of a debt to an assignee of his creditor before he can get a part of the securities pledged by him for a single, entire debt is obliging him to pay in fractions to other persons and permitting a creditor to "split up a single cause of action into many actions."

The reasons suggested for its applicability here are very strictly within the line of the language used by Mr. Justice Story in Mandeville vs. Welsh: It would subject the plaintiff to "many embarrassments and responsibilities not contemplated by his original contract." A part of the securities pledged to Nicholson being negotiable, have been irretrievably lost to the plaintiff without his receiving any compensation for the same. The stock purchased by him on margin and his negotiable hypothecated securities gone through the fault or misfortune of the original pledgee, and now to compel him to pay the portion of the debt (if debt it can be called) proportionate to the value of these securities, without regard to the securities that are lost to him, would most certainly be placing him in a position that could not have been for one instant contemplated by him.

I would only further state that should this view be deemed contrary to what may be considered the result arrived at in the case of the R. R. Co. vs. Davis, 28 Hun. 477, it may be said that the point was not raised and decided in that case.

Believing then that there was no valid custom shown justifying the transaction between the Nicholsons and defendant in relation to the stock in question, and that the plaintiff has not been estopped by what he has done, that the equities of the plaintiff extended farther than contended by

the defendant, and that the course of the Nicholsons was illegal when they undertook to separate the stock as security for different debts, and that the defendant from the character of the transaction and of the power given to Nicholson was put upon notice I shall grant the prayers of the plaintiff and reject those of the defendant.