(156 App. Div. 695.)

### WILLIAMS v. DELAWARE & HUDSON CO.

(Supreme Court, Appellate Division, First Department. May 9, 1913.)

1. JUDGMENT (§ 28*)—VALIDITY—PARTIAL VALIDITY.

Where a judgment was recovered against a common carrier upon bills of lading fraudulently issued by its agent in collusion with a shipper, and plaintiff's claims were assigned to him by a bank, which made loans upon the bills as collateral security and by the consignee, who made advances thereon, the judgment, which can be affirmed only in its entirety, must be reversed if the consignee be not entitled to recover, for the bank's advances would not warrant a recovery of the full amount.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 39; Dec. Dig. § 28.*]

2. CARRIERS (§ 57*)—LIABILITY OF RAILROAD COMPANY FOR ISSUANCE OF FICTITIOUS BILLS OF LADING.

Where an agent of a common carrier issued fictitious bills of lading to a consignor when no goods had been actually delivered, and the bills of lading were not marked nonnegotiable, but were in the ordinary form, which is freely transferable, the carrier is liable to one who made advances or lent money upon the bill without actual knowledge or reliable information that the recitals therein with respect to the receipt of the freight were untrue.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 169–178; Dec. Dig. § 57.*]

3. CARRIERS (§ 69*)—FICTITIOUS BILL OF LADING—LIABILITY OF PRINCIPAL—ACTIONS.

In an action upon fictitious bills of lading issued by a carrier's agent, evidence *held* sufficient to show that the consignee had notice that the recitals as to the delivery of the goods to the carrier were false.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 217–219, 222, 228, 230, 232–239; Dec. Dig. § 69.*]

4. ACTION (§ 5*)—CRIMINAL ACT—LIABILITY OF CARRIER—STATUTES.

Pen. Code, §§ 629, 633, making it a crime for the agent of a common carrier to issue a bill of lading without having received the freight, or to deliver freight for which an "order" bill of lading has been issued without its surrender, in no way changes the liability of a common carrier for the issuance of fictitious bills of lading by its agent. ·

[Ed. Note.—For other cases, see Action, Cent. Dig. §§ 25–27, 31–34, 36–39; Dec. Dig. § 5.*]

Scott, J., dissenting.

Appeal from Trial Term, New York County.

Action by William E. Williams against the Delaware & Hudson Company. From a judgment for plaintiff, and an order denying its motion for new trial, defendant appeals. Reversed and remanded.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Frank H. Platt, of New York City (William S. Opdyke, of New York City, Lewis E. Carr, of Albany, and George W. Field, of New York City, on the brief), for appellant.

H. Aaron, of New York City, for respondent.

LAUGHLIN, J.  The defendant is a common carrier of freight for hire, and this action was brought on assigned claims for damages caused by its failure to deliver 66,000 bushels of corn, 15,000 bushels of rye, and 76,000 bushels of oats for which its freight agent, Hugh C. Palmer, at Albany, signed and issued 37 order bills of lading between January 5 and February 26, 1910, inclusive, consigning the grain to the order of Durant & Elmore at the city of New York, containing directions to "notify Otto Keusch at New York City." The Durant & Elmore Company, which for brevity will be referred to as the consignor, was a corporation engaged in dealing in grain and its headquarters were at Albany.  It had succeeded to a copartnership business conducted at the same place by Durant & Elmore; and, according to the evidence, was the oldest and most respected house of the kind in the United States.  One Gibson Oliver was its treasurer, and managed its business.  It had been shipping over defendant's line since 1892, and shipped from 8,000 to 10,000 car loads per annum, and was defendant's largest shipper.

Keusch was a grain broker and a member of the Produce Exchange of the city of New York, and had been engaged in selling grain on commission on the Exchange since 1901, and was 30 years of age. He had sold grain to the consignor off and on from 1905, and in the spring of 1909 he sold a large quantity of buckwheat for it.  He testified that he handled bills of lading for the consignor representing 650,000 bushels, presumably including those in suit, and all until the failure of the consignor, which occurred on the 19th or 21st day of May, 1910.  By the custom of the trade and the rules of the Exchange, brokers to whom grain was consigned made advances thereon and attended to insurance, grading, selling, and adjusting claims for shortage and inferior quality, and for such services received a commission of one-half a cent per bushel on corn and oats, and one cent on rye and buckwheat.  At the close of navigation in 1909 it was generally understood by the trade that the consignor had "taken in" about 3,000,000 bushels of "cash corn" in Chicago "in lieu of December options."  On the 15th of December of that year the consignor shipped 36 or more carloads of oats to Keusch on consignment, and forwarded to him 4 bills of lading therefor, pursuant to which the grain was delivered in due course.  From that time on Keusch received from the consignor, at frequent intervals, bills of lading for corn and other grain shipped on consignment.  During December, 1909, and January and February, 1910, Keusch actually received from the consignor 300 cars of grain, and he received bills of lading, other than those in question, for about 225 more cars

of grain which did not arrive, and he had returned the bills of lading to the consignor before its failure.

The arrangement between the consignor and Keusch was that he was to sell the grain on its arrival, according to instructions transmitted, or to submit bids for the grain and sell if approved by the consignor, and, if not, the grain was to be "held in store." Palmer in violation of his duty to the defendant and acting in excess of his authority which was limited to issuing bills of lading for freight delivered to the defendant, and evidently in furtherance of a scheme, conspiracy, and plan with the consignor acting through Oliver to cheat and defraud the defendant, signed in the office of the consignor bills of lading, in standard form, in blank without having received any freight therefor, and left them there to be filled out and used at will, and they were under the direction of Oliver filled out by the bookkeeper and confidential clerk showing car numbers, weights of goods, and route as via defendant's railroad, which did not extend to New York, and the Erie and New York Central. This practice continued a year and a half or two years before the termination of Palmer's agency, which was stipulated to be the 8th or 9th day of March, 1910. Most of the bills of lading received by Keusch on and after December 15, 1909, before the 37 in question, and all of the 37, were issued in that manner without any of the grain which they purported to represent having been delivered to the defendant. According to the usual course of business, the consignor drew drafts on the broker, and attached them to the bills of lading and forwarded them, through local banks, for collection, and the drawee honored them, obtaining funds therefor, when necessary, by discounting his own notes secured by the bills of lading. That course was followed by the bills of lading upon which the action is based; and Keusch received all of the bills of lading excepting the last two the day after the dates thereof, which corresponded with the dates of the drafts, and the last two were received by him the second day after. He advanced in thus honoring the drafts the sum of $83,625, which with interest is the amount of the verdict. When the consignor failed, Keusch held 21 of these false bills of lading, and had pledged the other 16 with the Corn Exchange Bank, which made advancing money on warehouse receipts and bills of lading for grain a specialty, with other collateral. After the fraud was discovered, and it was found on demand duly made that the defendant had not received the grain, and therefore could not deliver it, Keusch and the bank on June 29, 1910, joined in an assignment to Elizabeth H. Donike, an employé of the bank, of whatever right or cause of action they or either of them had against the defendant, and she thereupon brought this action.

Of course, the entire recovery could not be sustained on the assignment from the bank, for its advances on any theory were much less; and it is impossible to tell whether the jury found for or against the plaintiff on that assignment, and therefore the judgment cannot in any event be sustained on the assignment from the bank, unless as matter of law plaintiff was entitled to recover in the right of the bank, and

made that point on the trial of the action. The plaintiff did not claim upon the trial to be entitled as matter of law to judgment for the amount advanced by the bank; and the learned trial court was not requested to rule on that point. The case was tried and submitted to the jury on the theory that it presented questions of fact under both assignments. We do not mean to intimate that it did not. The evidence, however, bearing on plaintiff's right to recover under each was materially different; and, while one important question of law is common to both, the right to recover under the assignment from the bank presents other legal questions.

[1] If the recovery cannot be affirmed in its entirety, it is not contended that any part of it can be sustained. It thus appears that the record does not present for decision any question with respect to plaintiff's right to recover under the assignment from the bank, and it is not claimed that it does. We therefore express no opinion on that point, and confine our decision to the questions arising under the assignment from Keusch, by which the plaintiff succeeded to his rights and no more.

[2] The recovery in the right of Keusch is sought to be sustained on the theory that the defendant is estopped from denying the authority of Palmer to issue the bills of lading; and the decision of the Court of Appeals in Bank of Batavia v. N. Y., L. E. & W. R. R. Co., 106 N. Y. 195, 12 N. E. 433, 60 Am. Rep. 440, is relied upon in support of that contention. That was an action based on a false bill of lading for 65 barrels of beans, issued by the carrier's agent in Batavia in collusion with one Williams, who purported to be the shipper, to recover the amount advanced to him by the local bank on the day of shipment on a draft on the fictitious consignee, to which the bill of lading was attached. On the contention then made that there was no privity between the bank and the carrier, the court held, on the authority of N. Y. C. & H. R. R. Co. v. Schuyler, 34 N. Y. 30, that no privity, other than that which flowed from the wrongful act, was necessary, and emphatically and unqualifiedly declared the settled law of agency, "that where the principal has clothed his agent with power to do an act upon the existence of some extrinsic fact necessarily and peculiarly within the knowledge of the agent, and of the existence of which the act of executing the power is itself a representation, a third person dealing with such agent in entire good faith, pursuant to the apparent power, may rely upon the representation, and the principal is estopped from denying its truth to his prejudice," applicable to bills of lading. Although that case was not decided on the theory that the bill of lading was negotiable, and it was declared that full negotiability did not attach to it, yet the court declined to hold as applicable the rule that an assignee of a chose in action, excepting where the assignor had been vested with apparent title, takes subject to the equities existing against it in the hands of his assignor (see Bush v. Lathrop, 22 N. Y. 535), which is held, in effect, in England and by the Supreme Court of the United States to apply to the transfer of bills of lading (Grant v. Norway, 10 C. B. 665; Friedlander v. Texas & Pac. Ry., 130 U. S. 416, 9 Sup. Ct. 570, 32 L. Ed. 997), but which had previously been repudiated in this jurisdiction (Armour v. Mich. Cent. R. R., 65 N. Y. 111,

22 Am. Rep. 603), and held, in effect, that bills of lading "carry with them the ownership, either general or special," of the property therein described, which ownership must be recognized by the carrier by only delivering the property on surrender of the bill of lading; and that it is known and expected by the carrier that, unless bills of lading are stamped "nonnegotiable," they will be transferred freely, and that advances will be made on the security thereof, and that, therefore, "those thus trusting to it and affected by it are not accidentally injured, but have done that they who issued the bill had every reason to expect," and the court then declared as the ground of the decision that:

"Considerations of this character provide the basis of an equitable estoppel, without reference to negotiability or directness of representation."

A like doctrine with respect to warehouse receipts had previously been declared in Griswold v. Haven, 25 N. Y. 595, 82 Am. Dec. 380, in which the basis for the rule was stated to be "that where the authority of an agent depends upon some facts outside the terms of his power, and which, from its nature, rests particularly within his knowledge, the principal is bound by the representation of the agent, although false, as to the existence of such fact," and declared the case analogous to one in which a partner is held liable for the fraud of his copartner, the theory of which is that as between two innocent parties that one shall suffer for the acts of a third party "who has been the cause or occasion of the confidence and credit" reposed in him.

I am of opinion that the doctrine of equitable estoppel does not protect one who purchases a bill of lading or makes advances thereon either with actual knowledge or with reliable information that the recitals therein with respect to the receipt of the freight by the carrier are not true. The opinion of Judge Finch in the Bank of Batavia Case, supra, contains a strong intimation to this effect, for the learned judge discusses, at some length, and points out, that in that case there was no one to inquire of save the agent who perpetrated the wrong, and there was nothing to arouse suspicion on the part of the bank that the representation in the bill of lading with respect to the receipt of the freight, was not true.

[3] It may be conceded that Keusch was not a party to the conspiracy to defraud the defendant, and that he did not have actual notice or knowledge thereof; but the evidence fairly shows that he had notice and understood before making the advances on most, if not all, of the bills of lading in question that the consignor had not delivered the grain to the carrier, and that the recitals in the bills of lading of the receipt of the grain by it were not true. The dates of the bills of lading in question, the amounts advanced thereon next day by Keusch, excepting the last two on which the advances were made the second day, and the advances by the bank, are as follows: 2 January 5th, advanced by Keusch $11,400, and by bank on one of them, January 7th, $6,200; 2 January 13th, advanced by Keusch $10,500, and by bank same day $12,300; 7 February 8th, advanced by Keusch $12,000, and on 6 of them by bank same day $10,540; 7 February 9th, advanced by Keusch $12,000, and by bank same day $12,400; 10 February 17th, advanced by Keusch $20,250; 7 February 18th, advanced by Keusch

$14,175; and 2 February 26th, on which Keusch advanced February 28th $3,300. Keusch knew before receiving any of the bills of lading in question that it took only about five days for the transportation of grain from Oneonta or any point on defendant's line to New York; and, when it was shipped at once, he had usually received it within about five days after the bills of lading were issued, and that on its arrival he would be promptly notified, and on surrender of the arrival notice and bill of lading the grain would be delivered to any one, and that, if it was not promptly removed, demurrage of $1 per day for each car would be charged. He knew that oftentimes the cars did not arrive for weeks, and even months, and that, when there was such delay, the cars remained under the control and subject to the further orders of the consignor, and that the bills of lading were liable to be recalled by the consignor. He understood perfectly well that the delay was not in transit, but was entirely at Oneonta, and that the grain was either in the consignor's elevator there, or in cars on its sidings near the elevator, and had not been delivered to the railroad, but was still in the possession of the consignor, that hundreds of car loads of grain, for which he had received bills of lading, were never shipped to New York, and that at the request of the consignor, on being reimbursed for his advances, he returned the bills of lading therefor. One of the conditions printed on the bills of lading provided that the carrier might make a charge for the detention of cars, or for the use of its tracks after a car had been held 48 hours for loading or unloading, and have a lien therefor, and that freight not removed within 48 hours after notice of arrival might be held in car or warehouse "subject to a reasonable charge for storage," or removed and stored in a public or licensed warehouse at the expense of the owner. Keusch says that he did not read this until after the consignor failed; but he knew that demurrage was regularly charged in New York City, and every arrival notice he received showed that a charge of $1 per day would be made for each car if not ordered unloaded within three days after arrival. He also knew that the consignor's profits were very small, and averaged only from $7.50 to $10 on a car load of grain. On these facts he was chargeable with knowledge that the consignor could not afford to load and hold the cars back so long at the point of shipment, if it was to be charged for the use of the cars, because it was evident that anything more than nominal charges for such use, even for a few days, would exceed the profits, and the consignor would be taking certain risks and transacting business for nothing. He was also aware that the shipment of the grain was delayed, not by the carrier, but by the consignor, and that the bills of lading were subject to be recalled by the latter and the intended shipments canceled.

It is contended however that, if this evidence would ordinarily have constituted notice to Keusch that the grain had not been delivered to the defendant, it did not in the case at bar, for Keusch says that he understood that the consignor had a "milling in transit privilege," under which it could unload and clean, or mill, or grind, the grain and reload it or the ground product into the same or other cars, and forward it, and that he had been informed by Oliver that the consignor had a "special arrangement" or "some arrangement" with defendant

for handling "everything in bond," and "by which grain could remain indefinitely on the cars," but that he did not know whether or not it was charged demurrage. Oliver absconded, and did not testify. The testimony of Keusch with respect to having received this information from Oliver is wholly uncorroborated, and, though uncontradicted, is quite improbable in so far as he claims to have been informed, and to have believed, that the defendant held the grain or permitted the consignor to hold it in cars indefinitely without a substantial charge for the use thereof. It would seem that he had had sufficient business experience to know that such information, if thus communicated to him, could not be true; and, if he was so informed, it is evident that he appreciated that it was a very unusual arrangement, and that he would have inquired into it further but for the fact that he feared that he would lose the consignor's business, and that inquiry would have revealed facts affecting the security of the bills of lading which he had accepted. Keusch knew that this grain was not grown in New York, and that it had come through from the West. Although the bills of lading were dated Albany, he also knew that the grain was to be shipped from Oneonta. In order to obtain low freight rates, grain was usually billed through to seaboard with "diverting" or "reconsignment" and "milling in transit" privileges. This consignor billed its grain through to Boston or Portland, via Lehigh Valley, Erie, or Lackawanna, from Buffalo to Binghampton, and thence via defendant's road, and its diverting point was Oneonta, where, to the knowledge of Keusch, it had and operated a flouring mill and elevator, and had several miles of railroad siding. Under the privilege of diverting or reconsigning, the consignor could change the destination to any point on a through rate line passing through the diverting point, and receive the benefit of the through rate to the new destination. As defendant's line did not form part of any through rate line to New York, if grain came to Oneonta on a through bill and the shipper wished to ship it to New York, or to terminate the shipment, he would lose the benefit of the through rate, and be obliged to pay local rates. One claim in behalf of the plaintiff is that Keusch supposed that this grain was detained or delayed or held under the diverting or milling in transit privilege.

The learned counsel for the appellant contends that the exercise of a "milling in transit privilege" required the surrender of the original bill of lading and the delivery of the grain and a subsequent redelivery to the carrier and issuance of a new bill of lading, giving the owner, however, the benefit of the through rate to the new destination; and, while this seems quite probable, it is not conceded and is not clearly shown by the evidence. Although Palmer was only the local freight agent at Albany, he had been until the 3d day of February, 1910, specially authorized to accept the surrender of through bills of lading and to issue new bills of lading for grain diverted at Oneonta under said diverting privilege; but he had nothing to do with respect to the milling in transit privilege. The evidence shows that the exercise of the diverting privilege involved the surrender of the original bill of lading for indorsement with

respect to the new destination, or the issuance of a new bill of lading, but no storing of the grain or other delay of any particular moment, and that the grain remained in the possession of the carrier    Keusch did not receive through bills of lading thus indorsed, but new bills, to which clearly no further diverting privilege attached. It would seem that the milling in transit privilege would not apply to such bills of lading, and that, when they were once issued, there would be no occasion for transferring the grain to other cars and have them arrive in "ex numbers," which means that the waybills, in addition to showing the numbers of the cars in which the grain arrived at destination, showed also numbers of other cars preceded by the Latin preposition "ex," indicating that the grain had been transferred therefrom, but on this point the evidence is not entirely clear. Keusch wrote the consignor January 6, 1910, saying that the bank in which he had pledged its bills of lading for about 100,000 bushels of grain was constantly "hollering" for insurance, and suggested that it write the bank, "stating that you are holding back the grain and not shipping it out at once; that is, stringing the shipment along. If you will do this, I can give the letter to the bank and it will hold them down a little bit." Keusch concedes that about the end of January or early part of February his suspicion was aroused, and he acquired more definite information with respect to the arrangement between the consignor and defendant and the manner in which the business was done. After February 7th, with sufficient knowledge that the grain had not been delivered to the carrier at the time the bills of lading were issued, or, at least, that it had not been delivered to defendant for shipment and might never be shipped, he advanced $61,725 of the amount for which the action is brought. He testified that "around the middle of January" he asked Oliver "why the stuff was so slow or why he was so long in holding it back," and that Oliver "intimated" to him that he had a special arrangement by replying that he did not want to send it down "except as the market warrants," but that he did not further question the manner in which the business was done until "the early part of February," when he found the cars arriving "in ex numbers," and that then he questioned Mr. Oliver about how the business "was handled," and it was explained to him "exactly how that business was done up there." He then conceded that he had been receiving cars "in ex numbers in January," but "did not notice it particularly" until he commenced to check up toward the end of January, when he was helping out in the office, at which time he held bills of lading for 200,000 or 250,000 bushels of corn, and then, on seeing that all the cars came down "in ex numbers," it "flashed" on him that he "wanted to know how that business was conducted up there," and he asked Oliver about it. He testified later, in substance, that the thought which then flashed over his mind was that the bills of lading were issued without the delivery of the grain to defendant, which is shown by the postscript to a letter to Oliver hereinafter quoted. He says that he and Oliver conversed by telephone daily; that the only inquiry he made with respect to the cars

being held back was of Oliver, who, "when letting it come down," would telephone to him, and say, "We are going to send you down so much corn or so much oats to-night;" that he had been urging Oliver to send the grain down quicker; that one reason for this was that his profit was small, and there would be none at all if he had to carry it 60 days; that about the 4th or 5th of February, after he had been "after" Oliver for a few days to get an explanation as to how the business was done, Oliver, who was apparently angry, said to him, "You seem to do a lot of worrying on our account, on our grain," and that, if Keusch did not want it. he would pay him off and get some one else to handle it, to which Keusch made answer that he did not mean any "insinuations," but "wanted to know how ine business was done up there," and thereupon Oliver said:

"Everything that is on the tracks we have got ladings for, and we draw on you; everything is handled under bond by the railroad company, and we keep it fully insured. * * * We have special arrangements up here, which I am not permitted to divulge, about handling this stuff."

Keusch claims that this statement satisfied him because the consignor was a big shipper, and he thought it might have special privileges. This was an unusual arrangement, and he was not justified in assuming that a local freight agent had authority to issue bills of lading in such circumstances; and other evidence shows that he did not become assured that the business was not being conducted irregularly or. fraudulently. He explained "ex numbers" as follows:

"When I say the cars came in 'ex numbers,' I mean by that that I get a different car later from the car that was mentioned in the bills of lading."

Other evidence shows that when grain is transferred in transit from one car to another, through an elevator or otherwise, a new waybill is issued giving both car numbers as already stated. All of the cars received by Keusch in the months of January and February arrived in "ex" numbers. With a view evidently to averting suspicion and deceiving those receiving the bills of lading without knowing that the grain had not been delivered to the carrier, Oliver from time to time shipped car loads of grain from the elevator or mill at Oneonta, where the grain had already been diverted by terminating shipments at that point, to Keusch; and, in order to secure the delivery thereof by the final carrier on the surrender of outstanding ficfitious bills of lading, he inserted in the shipping orders which he had presented to the carrier's shipping clerk at Oneonta, on which to waybill the grain out, car numbers as "ex" numbers corresponding with those on some of the outstanding bills of lading. It would seem that Oliver expected that Keusch would be notified of the arrival of cars by the new car numbers, because when he determined to make shipments he notified Keusch, giving the new car numbers in which the grain would arrive. The final carrier, however, gave notice by both the new and old car numbers, giving the dates of the waybills as well, which showed to Keusch that the shipments in every instance were quite recent and long after the dates of the bills of lading. Keusch's attention had been drawn to the fact that the grain was arriving in

different cars from those specified in the bills of lading prior to December 27, 1909, for he wrote Oliver about it that day.

On the 31st day of January, 1910, Keusch wrote Oliver a letter, which he marked "Personal & Confidential," stating among other things that he had bills of lading for about 240,000 bushels of corn on hand, and that the banks were "running around to see what is doing." He testified that this was not true, and that he wrote it to induce Oliver to send the grain on, which would indicate that he then thought that the consignor's course of business was irregular at least, or he could not have expected that such a letter would spur Oliver to greater activity. That letter indicated that the market for the grain represented by the bills of lading was not favorable, and that the banks were calling for more margin, and that it might be necessary for the consignor to remit funds, and contained a postscript written in ink by Keusch, as follows:

"The Produce Ex. Bank President called upon me today to explain to him why corn from Oneonta should be four or five weeks getting to N. Y. He claimed the R. R. Agents up there sign Ladings without the stuff being on cars—he said if that's the case the bank is not protected as the R. R. agent is not held for the Railroad for issuing such paper. I did not tell him that your grain all arrived under ex-numbers or he would have smelled a rat—I don't want the bank to get suspicious of your paper otherwise Otto (meaning himself) may sit down hard so please hustle the stuff along a little more."

Oliver replied to this letter, saying, among other things, that the consignor would furnish margins as might be required, and:

"Do not let those fellows scare you down there or get you nervous. * * * We have been holding this grain back as much as possible owing in a large extent to the prevailing conditions in the market, which are narrow, and also because of the billing that we have on this grain, on which we do not want to attract too much attention with the road by bunching them. Everything, however, is all right, and we will have the boys cleaning you up steadily now daily. There may be a break for a day or two and then the flood gates will be let loose, and you will be getting good arrivals daily, and will clean up with you before heading anything more your way, as we do not want to embarrass you in any way, shape or manner."

Keusch also says that the postscript was entirely false. But that, if true, would not aid the plaintiff, for although it is not very material whether Keusch thus acquired information that bills of lading were being issued without the delivery of the grain to the defendant, or gleaned that information from the course of business or from Oliver or another source, it emphasizes the point if he knew it before that time, and, as would seem, was merely letting Oliver know by a personal letter that the banks suspected it. Oliver did not deny the charge, and the statement in his answering letter about not wanting to attract the attention of the "road" by "bunching them" was direct notice that something had been concealed from defendant, and adds significance to his failure to deny the charge made in the postscript, for it indicates that he understood that Keusch knew that the grain had not been delivered to the defendant. A letter from Keusch to Oliver the next day, in which he acknowledged the receipt of reassuring telegrams and speaks of "everything" as being "salubrious," indicates that he had not

worried without cause for the Produce Exchange Bank called loans to him secured by the consignor's bills of lading, as he had expected; but he had been fortunate in placing them with the Corn Exchange Bank. He contradicts this letter by denying that that loan was called, and says he merely transferred the account. Keusch's attempted explanation of this postscript on the ground that he became "suspicious" concerning these bills of lading, and thought he "smelled a rat" at that time owing to a newspaper account of a litigation in Arkansas over bills of lading issued without delivery of the freight, and that his purpose in writing the postscript was to ascertain whether his suspicion was well grounded, is not satisfactory, and cannot be accepted. He admits that he was then on the right trail, and made a mistake in not following it up. His suspicion having been thus aroused, he received no assurance on the vital point. If we were to assume that he did not know the truth at that time, which is the view of the evidence most favorable to him and one to which he is not fairly entitled, still he was not in the circumstances warranted in making further advances on other bills of lading without further effort to ascertain the facts. He conceded, in effect, that he knew that he could have gone to a Car Service Agency, maintained on the Produce Exchange for that purpose, on January 31st, and have ascertained whether the bills of lading were fictitious, and that he refrained from so doing lest he might have found that it was true, for he answered a question as to whether he did not know that, as follows:

"Our money tied up there, how dare I feel for one moment I have a couple of hundred thousand dollars worth of rotten collateral in the house, that is what you say, is it?"

And he answered:

"I must not dare to let myself feel I had it. It would be a nice thing."

On February 16th Keusch, in response to inquiries by the Produce Exchange Bank for grain for which it held bills of lading issued January 21st and February 7th, stated that it was being held for a better market. On March 5th the inquiry was renewed, and he suggested that the bank write the defendant, and it did, describing the bills of lading and asking if defendant would guarantee them, and this led to the discovery by the defendant on March 9th or 10th by an admission on the part of both Palmer and Oliver that the bills of lading held by the bank, which they insisted were the only ones of the kind outstanding, were fraudulent and fictitious. Keusch did not know the result of that inquiry. His suggestion that the bank write the defendant tends to show that he was not aware of the fraudulent character of the bills of lading, but it does not indicate that he believed the defendant received the grain before it issued the bills of lading. On March 7th Oliver wired Keusch that he was sending down $50,000, the purpose of which was understood to be to take up and return bills of lading, and the next day, in reply to an inquiry by Keusch as to which ones, Oliver specified certain ones, and on learning of the inquiry by the Produce Exchange Bank called Keusch up on the telephone, and, assigning that as the reason, changed the order, and di-

rected that the bills of lading held by the bank be taken up, and that was done, and they were returned to Oliver and canceled. Keusch again on March 11th, instead of inquiring of defendant, or at the Car Service Agency, wrote Oliver that another pledgee of the bills of lading had inquired whether the grain had arrived, and asked Oliver to inform him whether these cars "were to come down all right," and on March 12th he wrote he had "a pile" of bills of lading ranging in date from December 31st to February 10th, and saying, "I am very much afraid that when the bank examiners get as far as the Corn Exchange Bank they will find some of those old ladings and the next thing I know I will be called for them," and asked for $100,000 to enable him to take up certain pledged bills of lading, and adding:

"However, please do not fail to take up the ladings where you are not going to ship the grain, because I am afraid I'll get it good and plenty some day. I would suggest that you take up those ladings right away if you do not expect to ship the stuff."

The correspondence shows that Keusch continued to urge Oliver to take up the old bills of lading, and in one stated that frightened bankers had called a loan for $20,000, and in another he speaks of having satisfied one creditor, but said he was "afraid that the bank might wake up some day," and on April 25th he wrote to the same effect, and said he could scarcely sleep nights he was worrying so "over this old collateral which I am now holding here for your account."

This analysis of the evidence plainly shows that Keusch relied upon the consignor, and not upon the bills of lading, or the liability of the defendant, on the theory that it had received and was holding the grain; and, if he did not, then equity and good conscience required that he should have communicated with the defendant when he had reason to believe, if, indeed, he did not actually know, that the grain had not been delivered to the railroad. On these facts there certainly was no equitable estoppel precluding the defendant from denying, as against Keusch, that it received the grain represented by the bills of lading upon which the major part at least of the advances were made.

The doctrine of the Bank of Batavia Case, which does not prevail in other jurisdictions (supra), should not be extended. It should be confined to bills of lading believed by the transferee to have been issued in the ordinary and usual course of business, and should not be applied to bills of lading such as those in question, which were known by Keusch not to have been so issued, but to have been issued pursuant to special arrangement by which the grain then in the possession of the consignor might be delivered to the railroad for shipment, or might not, according to the election of the consignor.

[4] The learned counsel for the respondent draws attention to certain provisions of the Penal Code, declaring crimes as follows, viz.: For the agent of a common carrier to issue a bill of lading without having received the freight (section 629), or to deliver freight for which an order bill of lading has been issued, without its surrender (section 633), or to pledge the property without the consent in writing

of the holder of the bill of lading; and he argues that Keusch was warranted in relying thereon. One of those statutory provisions was designed to prevent the perpetration of such frauds as that now under consideration; but they have no particular bearing on the issues in this case.

On the new trial, which must be ordered, the right of the plaintiff to recover under the respective assignments may be presented by separate motions, and, if the case shall be submitted to a jury, by special verdict as to each; and then, perhaps, there may be a final disposition of the case without another trial.

It follows that the judgment and order should be reversed and a new trial granted, with costs to appellant to abide the event.

INGRAHAM, P. J., and McLAUGHLIN and CLARKE, JJ., concur. SCOTT, J., dissents.